*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0174P (6th Cir.)
File Name: 00a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SHARON B. POLLARD,
    *Plaintiff-Appellee/*
        *Cross-Appellant,*

        *v.*

E. I. DUPONT DE NEMOURS
COMPANY,
    *Defendant-Appellant/*
        *Cross-Appellee.*



Nos. 98-6317/
6319; 99-5125

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 95-03010—Jon Phipps McCalla, District Judge.

Argued: May 4, 2000

Decided and Filed: May 26, 2000

Before: MERRITT, CLAY, and CUDAHY[*], Circuit
Judges.

_____

[*] The Honorable Richard D. Cudahy, Circuit Judge of the United
States Court of Appeals for the Seventh Circuit, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:** N. Victoria Holladay, WYATT, TARRANT & COMBS, Memphis, Tennessee, for Appellant. Kathleen L. Caldwell, TAYLOR, HALLIBURTON, LEDBETTER & CALDWELL, Memphis, Tennessee, for Appellee. **ON BRIEF:** John S. Wilson, III, N. Victoria Holladay, WYATT, TARRANT & COMBS, Memphis, Tennessee, J. Michael Brown, WYATT, TARRANT & COMBS, Louisville, Kentucky, for Appellant. Kathleen L. Caldwell, TAYLOR, HALLIBURTON, LEDBETTER & CALDWELL, Memphis, Tennessee, Alayne B. Adams, Memphis, Tennessee, for Appellee. Brian Owsley, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., for Amicus Curiae.

———————————

**OPINION**

———————————

MERRITT, Circuit Judge. Sharon Pollard and her husband brought this action against her employer, DuPont, for "continuing harassment based on her sex since 1987" under Title VII, as well as the common law injuries of intentional infliction of emotional distress, negligent supervision, and loss of consortium. The district court found that she was subjected to co-worker hostile work environment sexual harassment, that her DuPont supervisors were well aware of the discrimination, and that it resulted in a medical leave of absence from her job for psychological assistance and her eventual dismissal for refusing to return to the same hostile environment. We agree with the district court that the record demonstrates that DuPont employees engaged in flagrant discrimination based on gender and that DuPont managers and supervisors did not take adequate steps to stop it.

which Pollard endured over a period of months and years has been characterized as a type of slow torture. Her work was sabotaged, her personal safety was compromised, she was subjected to juvenile pranks intended to force her to resign from the shift, and she was repeatedly informed of her co-workers' belief in the inferiority of women. We found ourselves, after reviewing the record, proclaiming a sense of moral outrage that DuPont managers allowed the conduct of the men in the peroxide area to persist for years in silence, and therefore silent approval. Inaction by an employer, or another actor in a position to exercise control, in the face of continuous, deliberate, degrading treatment of another may rise to the level of intentional infliction of emotional distress. The tort would be unnecessary in our law as a deterrent if assault or physical harm were always made a necessary element.

We conclude that material issues of fact are presented by the outrageous nature of the conduct of DuPont employees together with the refusal of its managers to correct the situation and its blanket, continuing official denial in the face of contrary facts that discrimination based on gender occurred or that its managers were aware of the discrimination. A fact finder at the trial level will hear the case on remand and decide whether the plaintiff has met the standard enunciated by the Tennessee courts for the tort of intentional infliction of emotional distress. We therefore REVERSE the district court's decision to grant summary judgment to DuPont on this issue and REMAND for trial. Otherwise we AFFIRM the judgment of the district court. Plaintiff's motion to strike Pollard's reply brief is denied.

The claim of sexual harassment was tried before the court instead of a jury. Judge McCalla was so persuaded by Pollard's claim that in his order he concluded that "[t]his is a case of wretched indifference to an employee who was slowly drowning in an environment that was completely unacceptable, while her employer sat by and watched." The court awarded Pollard $107,364 in back pay and benefits, $300,000 in compensatory damages, the maximum permitted by the statutory cap, and attorney's fees in the amount of $252,997.38. DuPont now appeals the court's decisions, arguing 1) that there was no harassment or discrimination based on gender and that the trial court's factual finding that DuPont had actual knowledge of and responded indifferently to Pollard's harassment was clearly erroneous, 2) that the denial of judgment as a matter of law was improper because Pollard's claim was one of retaliation, not harassment, 3) that Pollard's harassment claim failed because she failed to show disparate treatment, 4) that judicial bias, hostility, and predetermination of facts precluded DuPont's receipt of a fair trial, and 5) that the award of attorney's fees to plaintiff was unreasonable.

Pollard cross-appeals on the bases that 1) front pay should not be subject to limitations on damages under § 1981a, 2) the statutory cap on compensatory damages is unconstitutional because it violates the doctrine of separation of powers and the Equal Protection Clause, and 3) the district court erred in granting summary judgment on Pollard's claim of intentional infliction of emotional distress.

### I. Facts

The district court's findings of fact are summarized as follows: Pollard began working for DuPont in 1977. In 1978 she was promoted to "assistant operator," and she was transferred to the hydrogen peroxide area of the plant in 1979. Of the approximately 28 employees in peroxide, four were women. Pollard was promoted to operator in 1987, and worked on "C" shift as one of the three operators on that shift

until 1992. On each shift, operator #1 is the control room operator, and operators #2 and #3 work in other areas of peroxide manufacture, keeping the pipes, valves and other machinery operating. Each operator's duties are different and none is superior in rank to the others. While Pollard was working on "C" shift, one of the assistant operators named Rory Brico refused to take direction from plaintiff because she was a woman. He placed a Bible on her desk open to the passage "I do not permit a woman to teach or have authority over man. She must be silent."

After that incident, plaintiff was transferred and became the #3 operator on "A" shift in 1992. The other operators on her shift were Steve Carney, the control room operator, and Jerry Lee, and the assistant operators were named Moody, Walker, and Cobb. The shift supervisor was David Swartz. During 1992 and 1993, the members of "A" shift got along without incident. In February 1994 the atmosphere abruptly changed. DuPont announced that it was going to participate in national Take Your Daughters to Work Day in April 1994, and Pollard was asked to give a talk to a group of girls coming to visit the plant. Some of the men on "A" shift, particularly Steve Carney and Jerry Lee, loudly complained about DuPont's participation in the program. A number of other men in peroxide were also against it, and they circulated an email entitled "Bull Malarky" to everyone in the plant discussing their displeasure with the program.

After plaintiff had discussions with both Steve Carney and Jerry Lee about Take Your Daughters to Work Day in early 1994, all of the men on the shift (with the exception of Mark Cobb, an assistant operator), stopped talking to plaintiff. Cobb's testimony, which was basically undisputed, indicated that Steve Carney, the control room operator, instructed all of the men on "A" shift to not eat with her, share food with her, be in the break room with her, or talk to her, and that Carney instructed the men not to follow any of Pollard's instructions without consulting with him first. Carney admitted in his

cornerstone of our entire body of civil rights law. In a political compromise, the Civil Rights Act of 1991 was limited in the remedies which it would provide due to a belief that unlimited damages for all forms of discrimination would force employers to institute hiring quotas for their own economic safety. *See* 137 Cong. Rec. S15472-01 (discussing the fear of quotas that drove the compromise which was reached in the Civil Rights Act of 1991). The adoption of the provision saving the remedies available under section 1981 was rationally related to the legitimate purpose of creating reasonable damages available to all other victims of intentional discrimination without being forced to limit the damages already available to victims of racial and ethnic discrimination.

For the foregoing reasons, we AFFIRM the opinion of the district court limiting plaintiff's award pursuant to 42 U.S.C. § 1981a.

### VII. Summary Judgment for the Defense on the Common Law Claims

Finally, plaintiff cross-appeals the district court's decision to grant summary judgment for the defense on plaintiff's claim of intentional infliction of emotional distress. The conduct alleged by a plaintiff must satisfy an extremely high burden in order to survive a motion for summary judgment with respect to a claim of intentional infliction of emotional distress in Tennessee. The district court in this case correctly quoted the appropriate language from *Dunn v. Moto Photo, Inc.*, 828 S.W.2d 747, 751 (Tenn. Ct. App. 1991), saying that the conduct must be that which would be deemed utterly intolerable in a civilized society. That case makes it clear that criminal, tortious, intentional, or malicious conduct does not automatically satisfy the standard. We believe, however, that the intentional and malicious conduct found by the district court in this case is unusually egregious and raises a factual issue with respect to the outrageousness of the behavior involved. The sort of daily, consistent harassing behavior

Pollard also argues that the statutory damages provision violates the Equal Protection Clause of the Fourteenth Amendment in that it unfairly discriminates among those persons who wish to vindicate their rights with respect to racial discrimination and those who wish to vindicate their rights with respect to gender discrimination. Since the statute at issue is a federal one, we assume that plaintiff meant to invoke the implied equal protection clause inherent in the Due Process Clause of the Fifth Amendment, which is applicable to the federal government. The parties agree that the statute must stand if it bears a rational relationship to any legitimate articulated government purpose.

42 U.S.C. § 1981a places a $300,000 statutory cap on all intentional discrimination on the basis of race, national origin, sex, religion, or disability (as defined in the Americans with Disabilities Act). The statute is inherently equitable on its face. The difference in the application of this statute in situations of gender or race discrimination occurs due to a provision in the Act which states that nothing in section 1981a is to be construed as in any way limiting the remedies provided in section 1981 itself, which does not limit recovery for intentional discrimination based upon race or national origin. However, section 1981 provides relief for a different type of claim than encompassed by the remedies available to plaintiff in section 1981a. Section 1981 provides for relief from discrimination in the making and enforcing of contracts, while section 1981a provides for relief purely from intentional discrimination in the employment context. While section 1981 includes contracts for employment, it also includes contracts for admission to organizations, insurance and other business contracts with private persons or corporations, and admission to schools. Plaintiff cannot therefore be said to be "similarly situated" with section 1981 claimants.

Even if plaintiff is similarly situated with a section 1981 claimant due to the fact that employment discrimination is covered under both acts, her claim still fails. Discrimination on the basis of race and national origin is indisputably the

testimony that "it was a possibility" that he had told the other men to disregard Pollard's directions.

It was common knowledge in the peroxide area that many of the men including Carney, Jerry Lee, and Rory Brico (of the Bible verse incident) did not approve of women working in the peroxide department. Testimony proved that Carney made remarks to this effect approximately five times per week, consistently, and that Carney routinely referred to women as "bitches," "cunts," "heifers," and "split tails." This language was commonly used by several men in peroxide, and Carney admitted that he used the terms to refer to women in general and to plaintiff in particular. In addition, DuPont had a company-sponsor support group called the Women's Network which the men vocally disapproved of Pollard attending. Plaintiff worked in this hostile environment for the next year and half.

In May 1994, after about two months of this treatment, David Swartz, the shift supervisor, held a training meeting. During a break in the meeting, Carney and Walker were having a discussion about a girl's softball team during which Carney said "that heifer can't coach" and "women have no business coaching" in reference to the woman who coached the team. Plaintiff was seated across the table, became upset, and asked to leave the meeting. She went to the nurse's station and asked the nurse to call David Swartz. When Swartz arrived, Pollard told Swartz that she could not take it anymore and that she was tired of the men always saying women couldn't do anything and degrading women. Swartz spoke with his supervisor about the incident, and they decided that Swartz should speak with the men individually about it. With the exception of Walker, none of the men on the shift remembered Swartz speaking with them about it. Carney testified that Swartz did approach him about not communicating with plaintiff immediately after the tension started in February, but that Swartz gave up on trying to talk to him about it because, according to Carney, "he knows I'm hardheaded . . . [and there] wasn't no sense in saying anything

else." In other words, Carney made it plain he was not going to change his behavior.

Swartz testified that he knew there was tension on the shift beginning in the spring of 1994 and that it did not improve for the rest of the year. He specifically testified that plaintiff complained to him about the lack of communication and isolation and other gender-based conduct on several occasions. The situation worsened in the summer of 1994. Plaintiff and Mark Cobb testified that Carney would go so far as to set off false alarms in plaintiff's area, causing her to run around the peroxide area in search of a non-existent problem. Cobb testified that Carney bragged to the other men that this was his way of showing that he, a man, was in control. If a false alarm was set while Pollard was on break cooking her dinner, the men would turn up the stove to burn her food while she was searching for the problem. In addition, Cobb testified that there were numerous incidents during which Carney would not tell plaintiff about actual alarms in her area. Plaintiff would therefore not respond to the problem, and it would appear to the operator on the next shift that she was not doing her job.

Plaintiff's job duties included monitoring the vaporizers in the peroxide tanks and determining when they should be moved. She was to sample the peroxide in a tank one hour after it was moved, and any delay would result in a weak product. Carney admitted instructing the assistant operators on several occasions to remove the vaporizers from the tanks earlier than plaintiff instructed without telling her. Again, this made it appear to the operator on the next shift that plaintiff was not doing her job, and additionally it affected whether customers would receive their shipments on time. This happened approximately seven times in 1994 and 1995, according to Pollard, with the last incident occurring in July 1995. After the first incident she spoke to the assistant operators about it, and they informed her that they were following Carney's instructions. After the second incident, Pollard spoke with Swartz about the problem. Pollard

other Circuits have reached a conclusion contrary to *Hudson*. *See Martini v. Federal Nat'l Mortgage Ass'n,* 178 F.3d 1336, 1348-49 (D.C. Cir. 1999); *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 556 (10th Cir. 1999); *Kramer v. Logan County Sch. Dist. No. R-1*, 157 F.3d 620, 625-26 (8th Cir. 1998). *See also Rivera v. Baccarat, Inc.*, 34 F. Supp.2d 870, 878 (S.D.N.Y. 1999); *Bizelli v. Parker Amchem*, 17 F. Supp.2d 949, 954 n.2 (E.D. Mo. 1998).

We agree with these arguments, but our hands are tied. One panel of this court may not overturn the decision of another panel of this court--that may only be accomplished through an en banc consideration of the argument. Plaintiff does not purport to distinguish *Hudson*. Therefore, we must decline to overturn the district court's decision that front pay is included in the compensatory damages statutory cap found at 42 U.S.C. § 1981a.

## VI. Constitutionality of the Statutory Cap on Damages

Plaintiff cross-appeals on the basis that the statutory cap on compensatory damages found at 42 U.S.C. § 1981a is an unconstitutional violation of the Separation of Powers doctrine. Pollard argues that by creating the statutory cap, Congress impermissibly encroached upon the judiciary and its "traditional responsibility" for assuring against excessive verdicts on a case-by-case basis. We do not find this argument persuasive. Congress created Title VII, and Congress may designate the remedies under Title VII. *See Northern Pipeline Construction v. Marathon Pipe Line Co.*, 458 U.S. 50, 83-84 (1982) (plurality opinion) (holding that where Congress creates a statutory right, "it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies.") The fact that the judicial branch is limited in the amount of damages which it may award does not mean that its ability to decide cases is being impaired by Congress.

argues that the attorney's fees are excessively high. Plaintiff argues only that the fees were "reasonable." Neither party gives any explanation, either with or without mathematical calculations, as to why the fees were "reasonable" or "unreasonable." Without a more specific claim that the attorney's fees were unreasonable, it is difficult to conclude that the award constituted an abuse of discretion. This was a hard-fought case which has gone on for four years. We are offered no basis for setting aside the fees, and therefore AFFIRM the district court's award of attorney's fees.

V.  Statutory Limitation of Front Pay

Pollard cross-appeals on the basis that front pay should not be subject to the limitations on "compensatory damages" under 42 U.S.C. § 1981a. The district court noted that it was bound by this Circuit's decision in *Hudson v. Reno*, 130 F.3d 1193 (6th Cir. 1997), which held that front pay was subject to the $300,000 statutory cap because front pay was an element of future pecuniary losses. Pollard now argues that front pay is not an element of future pecuniary losses, but is instead a replacement for the remedy of reinstatement in situations where reinstatement would be inappropriate. The Equal Employment Opportunity Commission, in an amicus brief, agrees with Pollard that the *Hudson* case was wrongly decided.

First, the argument is made that § 1981a, by its very terms, explicitly excludes remedies which were traditionally available under Title VII from the statutory cap, and notes that front pay was a traditionally available remedy. Second, the argument is made that the legislative history of the statutory cap on compensatory damages clearly indicates that front pay was not intended to be included in it. Third, plaintiff claims that the *Hudson* decision misinterpreted existing Sixth Circuit cases examining the nature of front pay as a remedy. And finally, Pollard and the EEOC argue that public policy concerns weigh in favor of excluding front pay from the $300,000 statutory cap on compensatory damages and that

discussed these ongoing communication problems with Swartz on numerous occasions. Swartz would tell Carney that he must call out the alarms and communicate with plaintiff, but Carney would tell Swartz that he was doing his job, and that Pollard was simply not doing her job. Swartz did not investigate further or discipline Carney. Carney was never suspended or fired for this behavior.

During the summer of 1994 plaintiff found the tires on the bicycle she rode from the gate to her section of the plant had been slashed. That day, Pollard complained to Swartz that she suspected Carney had done it. Swartz spoke with Carney, and he denied having done it. Swartz did not investigate further.

In December 1994, two of the assistant operators, Mark Cobb and David Walker, approached Swartz and asked him to call a meeting to discuss the treatment of Pollard by Carney and the other men. Swartz scheduled a meeting which they called the "first healing meeting." Carney was on vacation the day of the meeting. At the meeting, Walker and Moody told Pollard that Carney told them not to talk to her or communicate with her, and that Carney told them that Pollard was "keeping a book on them." Pollard told them that she was not doing so, and stressed the importance of communicating with her in order for her to do her job and to avoid possible dangerous consequences. David Swartz was present and heard all of plaintiff's complaints at this meeting.

Carney returned from vacation and was angry that a meeting had been held without him. He demanded a second meeting. During that meeting, plaintiff reiterated her concerns about the lack of communication and other problems. Plaintiff also mentioned her bicycle tire slashing, and told the group of another incident in which she believed Carney tried to run her off the road as she left the plant. Carney "got in plaintiff's face" and said "Nobody in this area likes you, you're here all alone, it's all your own fault." When plaintiff asked Swartz if he was going to allow Carney

to talk to her that way, Swartz said "I think that's enough" and ended the meeting. Nothing happened to change the situation.

The tension continued, and plaintiff continued to complain, both to Swartz and in her Women's Network meetings. Pollard told the group she was afraid for her safety and was concerned that a dangerous situation might arise in the peroxide area of which the men would not inform her. Beth Basham, David Swartz's supervisor, attended these meetings. She testified that she heard Pollard's complaints, and recognized that the problem in the peroxide area was due to the male workers not accepting a woman working in that area. In answer to a question on cross-examination, Basham testified that she was "of the firm belief that plaintiff had been harassed on account of her sex in the peroxide area." Basham, however, never investigated Pollard's complaints further.

In the face of this record, and despite the express testimony of management officials Basham and Swartz that they knew of the sexual harassment, counsel for DuPont--both at trial and in their briefs on appeal--maintain that there was no sexual harassment and that no DuPont managers had any knowledge of harassment. At oral argument on appeal, the following testimony from Basham, the general overall supervisor of the peroxide department, was read to Ms. N. Victoria Holladay, counsel for DuPont:

Q: And you were of the firm belief that she had been harassed on account of her sex in the peroxide area, correct?

A: Yes.

Q: Now, you talked about this situation with Alan Hubbell on several occasions, did you not?

A: Yes.

*Liteky v. United States*, 510 U.S. 540, 550 (1994) (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2nd Cir. 1943)).

There is no indication in the case at hand that the district court was in any way personally biased for the plaintiff before the trial began, nor is there evidence that DuPont was treated unfairly during the course of the trial. The remarks were made just prior to the conclusion of the defense case, after the district court had heard the vast majority of the evidence before it. In the absence of any evidence that the district court was unfair in his dealings with the defense during the course of the trial, it is difficult for us to conclude that the judge was unfairly biased. In addition, since there was no jury which could have been improperly influenced by the comments, there is no compelling reason to subject this case to a retrial. We believe the court's comments stemmed from the conclusions which the judge had rightly formed as part of his factfinding duty, although the comments were spoken in anger and moral outrage in response to the injustice and harm DuPont and some of its employees visited upon plaintiff. It is difficult to read the record in this case without sympathy for the plaintiff who endured, without relief, the cruelty of Steve Carney and other male co-workers at DuPont. We therefore DENY defendant's motion for a new trial.

### IV. Attorney's Fees

DuPont challenges the district court's decision to award plaintiff attorney's fees. Attorney's fee awards are reviewed for an abuse of discretion. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983). Attorney's fees are generally awarded for a reasonable number of hours expended multiplied by a reasonable fee, and are generally reduced in an amount reflective of the amount of time spent pursuing claims which were ultimately unsuccessful. DuPont argues that the award of attorney's fees ($252,997.38) should have been reduced due to the district court's summary judgment for the defense on the issues of intentional infliction of emotional distress, negligent supervision, and loss of consortium. DuPont also

final defense witness and the highest-ranking member of DuPont management who testified, Judge McCalla expressed his opinions with regard to this case. He angrily challenged Shaw and questioned him for a period of time, using language that was hostile and evidenced his desire to inform Shaw of the ways in which he believed DuPont had erred in their behavior towards Pollard. The court's comments seem to indicate three things: First, that after hearing all of the testimony (with only the remainder of Shaw's testimony to be heard), the court was quite convinced that the witnesses for the plaintiff were trustworthy and the key witnesses for the defense (the other members of "A" shift, including Steve Carney) were lying. Second, the court had also concluded that DuPont's actions in attempting to remedy the harassment were entirely unsatisfactory. And, finally, the court wanted Bob Shaw to hear his comments on the way DuPont handled this case so that DuPont could learn from its mistakes in this case and proceed differently in the future.

The standard of behavior expected of a judge is different when the case is tried to the bench rather than before a jury. The Supreme Court has recently concluded in language applicable to the conduct in this case:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."

Q:  And Mr. Hubbell's position in 1994-'95 was what?

A:  He was the area manager of hydrogen peroxide.

Joint Appendix at 412. In the face of this testimony expressly acknowledging sexual harassment and knowledge, counsel maintained that there was no such harassment and no knowledge by DuPont management.

In May 1995, a specialist in diversity training from DuPont headquarters named Bernie Scales attended the Women's Network meeting. Pollard told Scales of the problems in the peroxide area. Scales spoke to the plant manager about the problem, who subsequently spoke to Bob Shaw, employee relations manager for the plant. Shaw, Lee Ann Rice, and Gary Fish met with plaintiff on May 28, 1995 to discuss her complaints. According to Shaw and Rice, Pollard recounted fully all of her complaints at this meeting. Subsequently, Shaw and Rice spoke to Carney about his behavior. Carney never received a formal written reprimand, was never suspended, transferred, demoted, terminated, or in any other way disciplined for his behavior. There was no further investigation.

Carney's behavior improved for about a month (June 1995); he then returned to his old patterns of behavior in early July 1995. Plaintiff asked David Swartz to transfer her to another shift. Swartz offered to transfer her to the control room operator position on shift "C" with Rory Bricco, the man who had refused to take direction from her when he had been an assistant operator under her some years before, and who had initiated the Bible incident at that time. Plaintiff declined that offer. In late July 1995, Pollard discovered a highlighted copy of that same Bible verse in her locker, stating "A woman should learn in quietness and full submission. I do not permit a woman to teach or have authority over a man, she must be silent." Upon finding the note, plaintiff requested a medical leave of absence from DuPont.

In order to investigate the bible verse incident, DuPont formed a list of identical questions, answerable by a simple yes or no. When each employee denied having knowledge of the incident, no further questions were asked and the investigation was stopped. Carney himself was never questioned about his knowledge of who had placed the verse in Pollard's locker because he was on vacation at the time it occurred.

After Pollard left "A" shift, the entire shift, including supervisor David Swartz, held a party. They taped balloons to the ceiling and had a fish fry. The purpose of the party was to celebrate Pollard's departure, as Carney admitted in his testimony. Carney said at the party, "Glad the bitch is gone, glad the bitch is not coming back." David Swartz told Carney to shut up, that he did not need to hear Carney saying those things in case of future investigations concerning Pollard.

Plaintiff was on short-term disability leave for six months based in part on the advice of DuPont's psychologist. DuPont scheduled a "return to work" meeting in February of 1996 in spite of the psychologist's advice to the contrary, at which time DuPont told Pollard that they could not guarantee that she would not be put back on a shift with Steve Carney and the other members of "A" shift. When plaintiff declined to return to work under those conditions, DuPont fired her.

### II.  Hostile Work Environment Sexual Harassment

After reviewing the Supreme Court's decision in *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998), we recently concluded that a plaintiff seeking to establish a company's liability for acts of her co-workers must show that the employer "knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action." *Fenton v. HiSan, Inc.*, 174 F.3d 827, 830 (6th Cir. 1999).

Defendant DuPont challenges the district court's determination that plaintiff was harassed on the basis of her

work environment sexual harassment. The federal courts treat the two types of cases differently for good reason. The McDonnell Douglas framework is meant to prove that conduct which might have some otherwise legitimate motive (such as promoting a man instead of a woman) was in fact based upon discriminatory motive. When a plaintiff proves that a hostile work environment existed, there is no legitimate justification for such an environment, and thus recourse to the McDonnell Douglas test is not warranted. A defendant's only option is to deny the charges or argue that defendant effectively remedied the situation, not to submit that the hostile environment was in some way warranted. Additionally, as the Supreme Court recognized in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63-68 (1986), the proof of a hostile work environment is in fact part of "'the entire spectrum of disparate treatment of men and women'" in the workplace, which is in no way limited to actions which economically impact a plaintiff, such as decisions to hire, promote, or fire an employee. *Id.* at 64 (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707 (1978)). In other words, the Supreme Court has long recognized that proof of hostile work environment sexual harassment is proof of disparate treatment. For these reasons, it is one of the most basic tenets of employment discrimination law that it is not necessary to prove economic disparate treatment in order to make out a prima facie case of coworker hostile environment sexual harassment. The defendant's argument to the contrary is based upon a fundamental misunderstanding of the law.

For the foregoing reasons, we AFFIRM the district court's opinion finding DuPont liable for the co-worker sexual harassment of its employees.

### III.  Judicial Bias

DuPont also claims that the trial judge was so biased in his approach to this trial that DuPont was denied the fundamental right to a fair trial. During the testimony of Bob Shaw, the

investigation, even if ineffective, should shield DuPont from liability; and 4) that her complaints to her direct supervisor, David Swartz, as well as the complaints made in the context of Women's Network meetings, were not actually complaints to management about harassing conduct, and therefore did not put DuPont on actual notice of her problems.   These arguments are not persuasive.  Not only was it reasonable for the district court to conclude that members of DuPont management were actually aware of Pollard's harassment complaints, the district court was justified in finding that DuPont's reaction to Pollard's complaints did not constitute a "good faith" effort to remedy the situation.  As noted above, this trial produced substantial evidence that several members of DuPont management were aware of Pollard's situation, both through her complaints and through first-hand experience, but they allowed the situation to fester without definitive action on the part of management.  Steve Carney's behavior toward Pollard was well known.  No disciplinary action was taken against him.

We next address DuPont's argument that Pollard's claim was one of retaliation, not sexual harassment, and thus that the decision holding that sexual harassment existed must be reversed.  This is a red herring argument.  There is nothing in Pollard's testimony, her complaints to DuPont, or her complaint initiating this action which indicates that DuPont took adverse action against her for complaining of the treatment she was receiving on "A" shift.  The complaints indicate quite clearly that Pollard's problem was with her treatment by the other members of her shift and DuPont's inaction with respect to that problem, not any further action which DuPont took against her.

Finally, we turn to DuPont's claim that plaintiff cannot prevail on her claim of hostile work environment sexual harassment because she did not prove disparate treatment. Disparate treatment sexual harassment (assuming that by "disparate treatment" DuPont means harassment subject to the McDonnell Douglas test) is inherently different from hostile

sex because the conduct, according to DuPont, was gender-neutral and non-sexual in nature.  In order to prove that forms of conduct not inviting sexual relations constituted sexual harassment, plaintiff "'must show that but for the fact of her sex, she would not have been the object of harassment.'" *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

As the district court found, there was overwhelming testimony as to the anti-female animus which the men in peroxide consistently demonstrated, specifically toward women working in the peroxide area (as opposed to women filling traditionally "female" jobs, such as secretaries and office workers in other areas of the DuPont compound). We have recited these facts in detail above.

Plaintiff must prove that, after considering the totality of the circumstances and the context in which certain treatment of plaintiff occurred, the harassment which she sustained was sufficiently pervasive and severe as to alter the conditions of her employment and create an abusive working environment. Each alleged act of harassment must not be viewed in a vacuum, but must be considered together with the other acts. Characteristics such as their frequency, intensity, and whether they "merely" created psychological trauma or whether they actually interfered with a plaintiff's work are all factors to be considered.

In the recent *Williams* decision, we determined that the following behavior was severe and pervasive enough to constitute harassment: co-workers who used foul language, such as "fuck" and "slut"; sexual innuendos concerning the plaintiff's breasts or sexual prowess; tasteless sexually-based jokes and puns directed toward plaintiff; co-workers conspiring against her in order to force her onto another shift; objects glued to the top of her desk; being told "I'm sick and tired of these fucking women" and having a box thrown at her simultaneously; being denied overtime and breaks; and other

"pranks," such as being locked in a room, or finding materials blocking her way into or out of an area of the plant. *See Williams*, 187 F.3d at 559. This behavior seems clearly to encompass many types of sexual harassment: actual sexual propositioning, offensive language or behavior about women in general and women in the workplace, and non-sexual actions directed toward a plaintiff in order to interfere with her work. Plaintiff here proved daily sexually degrading comments about women which often occurred outside of her hearing; a co-worker who instructed the men working as her assistants not to take direction from plaintiff or talk to her at any time because of her gender; several incidents of plaintiff not being informed of facts concerning her job which would result in an appearance of incompetence on her part, and which could be potentially physically dangerous to her and to other members of the plant; isolated incidents occurring within her hearing of women being called "heifers" and being degraded for their inability to accomplish tasks as well as men; being subjected to false alarms and practical jokes, such as her dinner being burned, with the alleged intent of driving plaintiff away from her shift; and the Bible verse concerning women's proper submissive role being placed in her locker. This conduct constitutes severe and pervasive harassment, just as severe and pervasive as in *Williams* and our other co-worker sexual harassment precedent.

Next, we address the issue of whether or not DuPont received actual or constructive notice of Pollard's complaints and responded reasonably. DuPont challenges the court's factual findings, arguing that the findings concerning DuPont's lack of responsiveness towards Pollard's numerous complaints were clearly erroneous. Specifically, as pointed out above, DuPont continues to argue that the testimony at trial failed to establish that DuPont was ever made aware that any sex-based derogatory comments were addressed to Pollard. This argument assumes that only sex-based derogatory language is actionable under Title VII, and fails to consider the testimony related to a lack of work-related communication, sabotage of plaintiff's work, and personal

isolation and harassment, all of which was based on the belief that women should not work in the peroxide area.

After reviewing the trial testimony in this case, we believe that the trial court's findings of fact were correct. The testimony at trial indicated that plaintiff told her direct supervisor, David Swartz, of the incidents of harassment on numerous occasions. David Swartz, in particular, was independently aware of the language, isolation, and communication problems on "A" shift through his own observations of the shift, even absent plaintiff's complaints to him. In addition, Beth Basham, David Swartz's supervisor, testified that although she believed, based on Pollard's complaints during Women's Network meetings, that Sharon Pollard was being harassed by her coworkers because they could not accept a woman working in the peroxide area, she never initiated any further investigation concerning the allegations. After the most blatant episode, when Pollard found the Bible verse in her locker, DuPont management interviewed the members of "A" shift with a list of yes-or-no questions, and when they responded "no" to the question concerning knowledge about the event, the interviews were concluded. The lack of an admission under such circumstances is not surprising. No member of the peroxide area was ever formally reprimanded, suspended, or transferred to another shift due to any of their actions. Finally, Bob Shaw confirmed in his testimony that Sharon Pollard was told that if she returned to work, she would be put back on the same shift with Steve Carney and the other members of "A" shift, although a woman would be added to the shift.

This testimony is countered by DuPont's arguments 1) that the men were instructed not to behave inappropriately and to continue to communicate with Pollard as to work-related matters once DuPont became aware of Pollard's work isolation; 2) that DuPont posted notices explaining what constituted inappropriate conduct after learning of the July 1995 Bible verse incident and explained that conduct of that nature would result in termination; 3) that a good-faith