*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0274p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SHARON B. POLLARD,

        *Plaintiff-Appellee/*
        *Cross-Appellant,*

     *v.*

E.I. DuPONT DE NEMOURS, INC.,

        *Defendant-Appellant/*
        *Cross-Appellee.*

Nos. 03-6611/6612

———————————

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 95-03010—Jon Phipps McCalla, District Judge.

Argued: April 29, 2005

Decided and Filed: June 22, 2005

Before: KEITH, MERRITT, and CLAY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Raymond Michael Ripple, E.I. DuPONT DE NEMOURS AND COMPANY, Wilmington, Delaware, for Appellant. Kathleen L. Caldwell, Memphis, Tennessee, for Appellee. **ON BRIEF:** Raymond Michael Ripple, E.I. DuPONT DE NEMOURS AND COMPANY, Wilmington, Delaware, Stephen D. Goodwin, Maurice Wexler, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Memphis, Tennessee, for Appellant. Kathleen L. Caldwell, Memphis, Tennessee, Samuel J. Muldavin, Memphis, Tennessee, for Appellee.

———————————

## OPINION

———————————

     MERRITT, Circuit Judge. The parties in this wrongful discharge case waived trial by jury; and the District Court, upon remand from this Court, found that the plaintiff, Sharon Pollard, should prevail on her claim against her employer, DuPont, for intentional infliction of emotional distress under Tennessee law. Originally, the District Court had granted summary judgment for DuPont on this claim. Upon remand, the Court awarded plaintiff a total of approximately $2.2 million in compensatory damages (for back pay, front pay and infliction of emotional distress) and $2.5 million in punitive damages on the emotional distress claim. Although other less significant issues are raised, the primary issues before us on this second appeal are whether the Court erred in concluding

1

that DuPont was liable for the tort of intentional infliction of emotional distress under Tennessee law and whether the Court erred in its punitive damages award on this claim.

We have previously set out in great detail the unusual facts concerning the persecution and discrimination plaintiff suffered over a period of a year and a half at the hands of DuPont employees and managers before she was discharged. *See Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933 (6th Cir. 2000).[1]   In remanding the case to the District Court for reconsideration of Pollard's emotional distress claim, we held that the District Court had erred in granting summary judgment for DuPont on this issue.

## I.  Facts

The Court recited in detail many of the same facts in its first opinion in this case. *Pollard v. E.I. DuPont de Nemours, Inc.*, 213 F.3d 933, 937-41 (6th Cir. 2000).  These facts, plus additional facts which have occurred since that earlier opinion, are included here.  Pollard began working for DuPont in 1977.  In 1978 she was promoted to "assistant operator," and she was transferred to the hydrogen peroxide area of the plant in 1979.  Of the approximately 28 employees in peroxide, four were women.  Pollard was promoted to "operator" in 1987, and worked on "C" shift as one of the three operators on that shift until 1992.  On each shift, operator # 1 is the control room operator, and operators # 2 and # 3 work in other areas of peroxide manufacture, keeping the pipes, valves and other machinery operating.  Each operator's duties are different and none is superior in rank to the others. While Pollard was working on "C" shift, one of the assistant operators, Rory Bricco, refused to take direction from plaintiff because she was a woman.  He placed a Bible on her desk open to the passage "I do not permit a woman to teach or have authority over man.  She must be silent."

After that incident, plaintiff was transferred and became the # 3 operator on "A" shift in 1992.  The other operators on her shift were Steve Carney, the control room operator, and Jerry Lee; the assistant operators were Moody, Walker, and Cobb.  The shift supervisor was David Swartz. During 1992 and 1993, the members of "A" shift got along without incident.  In February 1994 the atmosphere abruptly changed.  DuPont announced that it was going to participate in national Take Your Daughters to Work Day in April 1994, and Pollard was asked to give a talk to a group of girls coming to visit the plant.  Some of the men on "A" shift, particularly Steve Carney and Jerry Lee, loudly complained about DuPont's participation in the program.  A number of other men in peroxide were also against it, and they circulated an email entitled "Bull Malarky" to everyone in the plant discussing their displeasure with the program.

After plaintiff had discussions with both Steve Carney and Jerry Lee about Take Your Daughters to Work Day in early 1994, all of the men on the shift (with the exception of Mark Cobb, an assistant operator), stopped talking to plaintiff.  Cobb's testimony, which was basically undisputed, indicated that Steve Carney, the control room operator, instructed all of the men on "A" shift not to eat with her, share food with her, be in the break room with her, or talk to her, and that Carney instructed the men not to follow any of Pollard's instructions without consulting with him first.  Carney admitted in his testimony that "it was a possibility" that he had told the other men to disregard Pollard's directions.

---

[1]*See also Pollard v. E.I. DuPont de Nemours & Co.*, 532 U.S. 843 (2001), in which the Supreme Court held, on plaintiff's appeal from this Court's decision, that in a Title VII wrongful discharge case "front pay" is not subject to the damages cap imposed by 42 U.S.C. § 1981a(b)(3) and remanded the case for reconsideration of the front pay issue, including damages. On remand the District Court awarded substantial front pay for the years Pollard would have worked until retirement had she not been discharged by DuPont.

It was common knowledge in the peroxide area that many of the men including Carney, Jerry Lee, and Rory Bricco (of the Bible verse incident) did not approve of women working in the peroxide department. Testimony proved that Carney made remarks to this effect approximately five times per week, consistently, and routinely referred to women as "bitches," "cunts," "heifers," and "split tails." This language was commonly used by several men in peroxide, and Carney admitted that he used the terms to refer to women in general and to plaintiff in particular. In addition, DuPont had a company-sponsored support group called the Women's Network which the men vocally disapproved of Pollard attending. Plaintiff worked in this hostile environment for the next year and a half.

In May 1994, after about two months of this treatment, David Swartz, the shift supervisor, held a training meeting. During a break in the meeting, Carney and Walker were having a discussion about a girl's softball team during which Carney said "that heifer can't coach" and "women have no business coaching" in reference to the woman who coached the team. Plaintiff, who was seated across the table, became upset and asked to leave the meeting. She went to the nurse's station and asked the nurse to call David Swartz. When Swartz arrived, Pollard told Swartz that she could not take it anymore and that she was tired of the men always degrading women and saying they could not do anything. Swartz spoke with his supervisor about the incident, and they decided that Swartz should speak with the men individually about it. With the exception of Walker, none of the men on the shift remembered Swartz speaking with them about it. Carney testified that Swartz did approach him about not communicating with plaintiff immediately after the tension started in February, but that Swartz gave up on trying to talk to him about it because, according to Carney, "he knows I'm hardheaded . . . [and there] wasn't no sense in saying anything else." In other words, Carney made it plain he was not going to change his behavior. Swartz and other supervisors in the plant took no effective action to deter the discrimination against Pollard.

Swartz testified that he knew there was tension in the shift beginning in the spring of 1994 and that it did not improve for the rest of the year. He specifically testified that plaintiff complained to him about the lack of communication and isolation and other gender-based conduct on several occasions. The situation worsened in the summer of 1994. Plaintiff and Mark Cobb testified that Carney would go so far as to set off false alarms in plaintiff's area, misdirecting her and causing her to search for a non-existent problem. Cobb testified that Carney bragged to the other men that this was his way of showing that he, a man, was in control. If a false alarm was set while Pollard was on break cooking her dinner, the men would turn up the stove to burn her food while she was searching for the problem. In addition, Cobb testified that there were numerous incidents during which Carney would not tell plaintiff about actual alarms in her area. Plaintiff would therefore not respond to the problem, and it would appear to the operator on the next shift that she was not doing her job.

Plaintiff's job duties included monitoring the vaporizers in the peroxide tanks and determining when they should be moved. She was to sample the peroxide in a tank one hour after it was moved, and any delay would result in a weak product. Carney admitted instructing the assistant operators on several occasions to remove the vaporizers from the tanks earlier than plaintiff instructed without telling her. Again, this made it appear to the operator on the next shift that plaintiff was not doing her job, and additionally it affected whether customers would receive their shipments on time. This happened approximately seven times in 1994 and 1995, according to Pollard, with the last incident occurring in July 1995. After the first incident she spoke to the assistant operators about it, and they informed her that they were following Carney's instructions. After the second incident, Pollard spoke with Swartz about the problem. Pollard discussed these ongoing communication problems with Swartz on numerous occasions. Swartz would tell Carney that he must call out the alarms and communicate with plaintiff, but Carney would tell Swartz that he was doing his job, and that Pollard was simply not doing her job. Swartz did not investigate further or discipline Carney. Carney was never suspended or fired for this behavior.

During the summer of 1994 plaintiff found that the tires on the bicycle she rode from the gate to her section of the plant had been slashed.  That day, Pollard complained to Swartz that she suspected Carney had done it.  Swartz spoke with Carney, and he denied having done it.  Swartz and other supervisors in the plant did not investigate further.

In December 1994, two of the assistant operators, Mark Cobb and David Walker, approached Swartz and asked him to call a meeting to discuss the uncivilized treatment of Pollard by Carney and the other men.  Swartz scheduled a meeting which they called the "first healing meeting."  Carney was on vacation the day of the meeting.  At the meeting, Walker and Moody told Pollard that Carney told them not to talk to her or communicate with her, and that Carney told them that Pollard was "keeping a book on them."  Pollard told them that she was not doing so, and stressed the importance of communicating with her in order for her to do her job and to avoid possible dangerous consequences.  David Swartz was present and heard all of plaintiff's complaints at this meeting.

Carney returned from vacation and was angry that a meeting had been held without him.  He demanded a second meeting.  During that meeting, plaintiff reiterated her concerns about the lack of communication and other problems.  Plaintiff also mentioned her bicycle tire slashing, and told the group of another incident in which she believed Carney tried to run her off the road as she left the plant.  Carney "got in plaintiff's face" and said, "Nobody in this area likes you, you're here all alone, it's all your own fault."  When plaintiff asked Swartz if he was going to allow Carney to talk to her that way, Swartz said "I think that's enough" and ended the meeting.  Nothing happened to change the situation.

The tension continued, and plaintiff continued to complain, both to Swartz and in her Women's Network meetings.  Pollard told the group she was afraid for her safety and was concerned that a dangerous situation might arise in the peroxide area of which the men would not inform her.  Beth Basham, David Swartz's supervisor, attended these meetings.  She testified that she heard Pollard's complaints, and recognized that the problem in the peroxide area was due to the male workers not accepting a woman working in that area.  In answer to a question on cross-examination, Basham testified that she was "of the firm belief that plaintiff had been harassed on account of her sex in the peroxide area."  Basham, however, never investigated Pollard's complaints further, and again nothing changed.

In the face of this record, and despite the express testimony of management officials Basham and Swartz that they knew of the sexual harassment, counsel for DuPont — both at the original trial and in their briefs on the first appeal — maintained that there was no sexual harassment and that no DuPont managers had any knowledge of harassment.  For example, at oral argument on the first appeal, the following testimony from Basham, the general overall supervisor of the peroxide department, was read to counsel for DuPont:

> Q:      And you were of the firm belief that she had been harassed on account of her sex in the peroxide area, correct?
> A:      Yes.
> Q:      Now, you talked about this situation with Alan Hubbell on several occasions, did you not?
> A:      Yes.
> Q:      And Mr. Hubbell's position in 1994-'95 was what?
> A:      He was the area manager of hydrogen peroxide.

In the face of this testimony expressly conceding management's knowledge of persistent sexual harassment, DuPont and its counsel maintained that there was no such harassment and no knowledge by DuPont management.  Subsequently, in the proceedings on remand, the DuPont plant manager

finally acknowledged the real facts, and now counsel on this appeal has forthrightly acknowledged the discrimination and the company's failure to investigate and take appropriate steps.

In May 1995, a specialist in diversity training from DuPont headquarters named Bernie Scales attended the Women's Network meeting. Pollard told Scales of the problems in the peroxide area. Scales spoke to the plant manager about the problem, who subsequently spoke to Bob Shaw, employee relations manager for the plant. Shaw, Lee Ann Rice, and Gary Fish met with plaintiff on May 28, 1995, to discuss her complaints. Subsequently, Shaw and Rice spoke to Carney about his behavior. Carney never received a formal written reprimand, was never suspended, transferred, demoted, terminated, or in any other way disciplined for his behavior. There was no further investigation.

Carney's behavior improved for about a month (June 1995); he then returned to his old patterns of behavior in early July 1995. Plaintiff asked David Swartz to transfer her to another shift. Swartz offered to transfer her to the control room operator position on shift "C" with Rory Bricco, the man who had refused to take direction from her when he had been an assistant operator under her some years before, and who had initiated the Bible incident at that time. Plaintiff declined that offer. In late July 1995, Pollard again discovered a highlighted copy of that same Bible verse from I Timothy in her locker, stating, "A woman should learn in quietness and full submission. I do not permit a woman to teach or have authority over a man, she must be silent." Upon reading the note, plaintiff requested a medical leave of absence from DuPont. The record is not clear about what caused this male animus against the lone female in the work unit. There is no indication that her actions or temperament were aggressive and likely to provoke anger. The reason given in the Bible verse — that the male subjugation of the female is a natural part of the relationship — demonstrates gender bias, pure and simple.

In order to investigate the Bible verse incident, DuPont formed a list of identical questions, answerable by a simple yes or no. When each employee denied having knowledge of the incident, no further questions were asked and the investigation was stopped. Carney himself was never questioned about his knowledge of who had placed the verse in Pollard's locker because he was on vacation at the time it occurred.

After Pollard left the "A" shift, the entire shift, including supervisor David Swartz, held a party. They taped balloons to the ceiling and had a fish fry. The purpose of the party was to celebrate Pollard's departure, as Carney admitted in his testimony. Carney said at the party, "Glad the bitch is gone, glad the bitch is not coming back." David Swartz told Carney to "shut up," because he did not need to hear Carney saying those things in case of further investigations concerning Pollard.

Plaintiff was on short-term disability leave for six months based in part on the advice of DuPont's psychologist. DuPont scheduled a "return to work" meeting in February of 1996 in spite of the psychologist's advice to the contrary, at which time DuPont told Pollard that they could not guarantee that she would not be put back on a shift with Steve Carney and the other members of "A" shift. When plaintiff declined to return to work under those conditions, DuPont fired her.

At the first trial the District Court granted back pay and compensatory damages for wrongful discharge under Title VII, declined to grant front pay and granted summary judgment in favor of DuPont on the emotional distress claim. On the first appeal this Court affirmed on the back pay and damages and (based on prior binding Sixth Circuit precedent) affirmed on the front pay issue. We reversed and remanded on the emotional distress issue as explained above. As noted in footnote 1 above, the Supreme Court reversed and remanded on the front pay issue. Therefore, the District Court reconsidered the emotional distress and front pay issues on remand.

The District Court conducted a hearing at which evidence was presented related to the emotional injury suffered by Pollard as a result of her treatment at work. The effects of this injury include depression, anger, irritability, and a sense of being "lost." She fears encountering her former co-workers and, as a result, avoids certain stores and geographic areas where they live. She has nightmares, nausea, episodes of breaking out in cold sweats and is easily startled. She requires medication for anxiety and to help her sleep. Her psychiatrist expert diagnosed her with post-traumatic stress disorder and a major depressive disorder. For a complete description of Pollard's emotional injury, see *Pollard v. E.I. DuPont de Nemours, Inc.*, 338 F. Supp. 2d 865, 869-71, 873-74 (W.D. Tenn. 2003).

## II.  Intentional or Reckless Infliction of Emotional Distress

The District Court on remand correctly held that Tennessee courts have adopted § 46 of the RESTATEMENT (SECOND) OF TORTS (1965), which requires serious mental injury from "conduct . . . outrageous in character . . . and utterly intolerable in a civilized community" by an actor who "intentionally or recklessly" causes the emotional injury. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Doe v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 37 (Tenn. 2005) ("Recklessness as conscious disregard [under § 46] requires that the actor be aware of a substantial and unjustifiable risk of harm.").

On the previous appeal, DuPont argued, as recited above, that the conduct in question did not amount to sexual harassment and that, even if it did, management was not aware of the conduct of the employees. The company does not repeat that argument on this appeal. To the contrary, it now argues that Swartz, as supervisor over the hydrogen peroxide units, attempted to deter the conduct by calling two "healing meetings" with some of the employees and that some investigation occurred. Unlike its previous denials, the company now concedes that it knew of the outrageous discriminatory conduct and that it was "neither effectively investigated nor otherwise appropriately handled." Appellant's brief, p. 51.

It may be true that the DuPont plant manager in Memphis and that upper management at its Wilmington headquarters did not deliberately set out to harm Pollard, but there can be no doubt that supervisors and management officials in both Memphis and Wilmington made no real effort to intervene to stop the harassment that had been brought to their attention on numerous occasions. The District Court found that no one from DuPont ever reprimanded, suspended, transferred, demoted or terminated Carney. Supervisors and other management officials stood idly by as the harassment continued day after day, week after week, month after month. Swartz, Pollard's immediate supervisor, watched the entire process unfold, and when Pollard left the unit he attended a party celebrating her departure — an act that raises a strong inference of the intent to cause emotional distress, as the District Court rightly concluded. We, therefore, find no error in the District Court's conclusion that DuPont should be liable for the tort of intentional or reckless infliction of emotional distress upon the plaintiff.

Under Tennessee law, a corporate body may be liable for the infliction of emotional distress if its corporate supervisors and officials engage in conduct that rises to the level of reckless disregard of outrageous conduct — the type of conduct found in this case. In *Doe v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22 (Tenn. 2005), the Tennessee Supreme Court, in a priest pedophilia case, reversed summary judgment in favor of the Nashville Diocese, whose officials had allegedly acted with deliberate indifference to information that a priest was sexually abusing children. In deciding the case, the Tennessee Supreme Court identified disputed facts that, if resolved in favor of the plaintiff, could have supported a finding of liability. These facts included (1) the church's awareness of its employee's outrageous conduct, (2) its failure to report or investigate the allegations of misconduct, and (3) its failure to place effective restrictions on the employee after it became aware of the misconduct. *Doe*, 154 S.W.3d at 42. In the instant case, the trial court has resolved a

strikingly similar legal dispute in favor of Ms. Pollard. By clear implication, *Doe* stands for the proposition that a corporation may be held liable in such circumstances, and DuPont points to no Tennessee authority that would relieve the company from corporate liability for the tort. The liability is based not on vicarious liability. Rather, it is based on the entity's failure to act in the face of outrageous conduct by persons under its immediate control who are causing serious harm within the general scope of employment and within the knowledge of its officials. DuPont has pointed us to no case that would require the corporation's board of directors or its highest officers to themselves have culpable knowledge of the conduct by lower officials.

### III.  DuPont's Waiver of the Exclusivity Provision of the Workers' Compensation Statute

On appeal, DuPont, as appellant, argues for the first time in its reply brief that the exclusivity provision of Tennessee's workers' compensation statute, Tenn. Code Ann. § 50-6-108(a) ("the rights . . . herein granted to an employee subject to the Workers' Compensation Law on account of personal injury . . . shall exclude all other rights and remedies . . . on account of such injury . . . .") bars Pollard's infliction of emotional distress claim. DuPont relies on *Valencia v. Freeland & Lemm Constr. Co.*, 108 S.W.3d 239 (Tenn. 2003), holding that the exclusivity provision bars all claims of "gross, wanton, willful . . . reckless, culpable or malicious negligence . . . short of *general intentional injury*." *Id.* at 242 (emphasis in original) (quoting *Mize v. Conagra, Inc.*, 734 S.W.2d 334, 336 (Tenn. Ct. App. 1987)).

It is clear, however, that under Tennessee law DuPont's reliance on this statutory bar at this late date in the proceeding constitutes a waiver of this defense. In *Hammett v. Vogue, Inc.*, 165 S.W.2d 577 (Tenn. 1942), an employee sued her employer for an assault and battery committed against her by the store manager. The employer-defendant waited until after it had lost at trial and had its motion for a new trial denied by the court before it raised the exclusivity provision of the workers' compensation statute as grounds for dismissing the case. The court held "that the exception [to common-law liability under the workers' compensation statute] can never be regarded as an element of the plaintiff's cause of action; it is a matter of defense and must be specially pleaded." *Id.* at 579. In support, the Tennessee Supreme Court quoted an earlier case that dealt with a defendant raising the statute of limitations at the eleventh hour:

> To allow the defendant to proceed with his defense, and speculate upon his chances of a successful opposition, until a large bill of costs has accumulated, and then, when he finds the chances against him, to permit him to interpose the statute, would be an unreasonable advantage to him at the expense of the plaintiff. If the contract is voidable under the statute, and the defendant intends to rely upon that fact and avoid it, *it is but just that he should so notify the plaintiff, to the end that the litigation may end.*

*Id.* at 580-81 (emphasis in original) (quoting *City v. Southern Queen Mfg. Co.*, 24 S.W. 121, 122 (1893)). The Court noted disapprovingly that the employer had waited until the statute of limitations had run on any workers' compensation claim the plaintiff could have brought. *Hammett* was cited in 1997 by the Tennessee Court of Appeals for the proposition that the exclusivity provision "must be affirmatively pleaded." *Douglas v. E & C Carroll Enter., Inc.*, No. 03A01-9606-CV-00283, 1997 WL 45343 (Tenn. Ct. App. Feb. 6, 1997).

DuPont did not plead the exclusivity provision as a bar to liability for the claim of infliction of emotional distress in its answer or at any time prior to its reply brief filed in this second appeal. Under Tennessee law, the failure to raise the defense is treated like a statute of limitations defense and is waived if not raised early in the proceeding. Therefore, the defense is waived, and we need not analyze whether it would have barred the claim if raised in a timely manner.

## IV. Punitive Damages

In a previous decision, the District Court awarded back pay and accrued benefits to Pollard of $107,000 and $300,000 in compensatory damages under Title VII, for a round-figure total of $400,000. The Court later awarded plaintiff an additional amount of $853,215 in front pay after the remand from the Supreme Court in *Pollard v. E.I. DuPont de Nemours & Co.*, 532 U.S. 843 (2001), opened the door to front pay. The Court awarded an additional amount of compensatory damages of $950,000 in light of its opinion on the infliction of emotional distress upon remand from this Court. Thus, the total amount of compensatory damages awarded was approximately $2.2 million. To this amount, the District Court added $2.5 million in punitive damages making a ratio of total compensatory damages to punitive damages of approximately 1-to-1 and a ratio of 2-to-1 for compensatory damages other than back pay and front pay.

Under Tennessee law, standard appellate review of punitive damages awards requires deference to the findings of the trial court "unless amounts fixed are so excessive as to indicate passion, prejudice and caprice on the part of the trier of fact." *Coakley v. Daniels*, 840 S.W.2d 367 (Tenn. Ct. App. 1992). DuPont concedes at page 49 of its opening appellate brief that there is "no dispute that the District Court utilized the correct standard in evaluating the need for punitive damages as set forth in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992)." The *Toof* case, as DuPont outlines in its brief, sets out nine factors which the District Court weighed — for example, the financial condition of the defendant, the reprehensibility and duration of its conduct, whether the defendant after learning of the misconduct "attempted to make amends," and the expense borne by the plaintiff in an attempt to recover. *See also Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 333 (Tenn. 1996).

DuPont argues that no punitive damages should have been awarded or that a reduction in punitive damages should be made by this Court. It argues that (1) there was no "purposeful intent or motive . . . to cause Pollard harm" but rather "an inept investigation;" (2) that the duration of the conduct was a year and a half, (3) that DuPont offered a settlement of $1.2 million after this Court remanded the case to the District Court for reconsideration and after the Supreme Court had granted certiorari on the issue of front pay which it subsequently decided in Pollard's favor, (4) that DuPont subsequently changed its policies and training program for employees as a "direct result of the sexual harassment Pollard endured at the Memphis site," and (5) the award should be reduced because of the substantial nature of the compensatory damages.

The punitive damages award takes into account the basic factors outlined in the *Toof* case. We have approved the District Court's finding that Pollard's severe emotional injury was caused by the "intentional or reckless" conduct of DuPont's supervisors and officials and that this conduct clearly meets the requirements of § 46 of the RESTATEMENT (SECOND) OF TORTS, the standard adopted by the Tennessee Supreme Court. Although it is true that DuPont managers and officials did not conspire to subject Pollard to injury, her direct supervisor appears to have either approved the uncivilized harassment, or to have been so deliberately indifferent to it as to amount to reckless disregard of the outrageous conduct he witnessed over the course of a year and a half. Other management officials at DuPont, upon learning of the situation, took no effective steps to stop it.

The District Court noted and discussed at length the fact that as a direct result of this case, DuPont changed its policies to prevent such conduct in the future. But the Court also noted that for years DuPont took the position that it had handled the case appropriately and even claimed that its officials had no knowledge of the sexual harassment. The District Court balanced these competing factors, including DuPont's $1.2 million settlement offer made after this Court remanded the case to the District Court but before the Supreme Court's ruling on front pay. In light of the fact that the District Court followed the appropriate legal standard and made no factual errors, we find no error in the District Court's assessment of punitive damages under Tennessee law.

DuPont also argues that the punitive damages of $2.5 million should be eliminated or reduced under a federal constitutional theory. It relies on a due process theory based on the recent Supreme Court case of *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). In that case the lower court awarded $145 million in punitive damages after upholding a $1 million compensatory damages award. The Supreme Court found this 145-to-1 ratio of punitive to compensatory damages to be much too high. In such cases, appellate courts must engage in "exacting appellate review," *id.* at 418, of the relationship between the compensatory and punitive damages. The Court indicated that a ratio greater than "single digits" in such cases as *Campbell* will probably not meet the due process standard ("few awards exceeding a single-digit ratio . . . will satisfy due process," *id.* at 415) and that more than a 4-to-1 ratio "might be close to the line of constitutional impropriety." *Id*. at 425. The Court also noted that "when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* In the *Campbell* case, the lower court on remand then reduced the punitive damages to $9 million — a 9-to-1 ratio. *Campbell v. State Farm Mut. Aut. Ins. Co.*, 98 P.3d 409 (Utah 2004), *cert. denied*, 125 S. Ct. 114 (2004).

The ratio ordered by the District Court comes within the *Campbell* due process standard. The total compensatory damages of $2.2 million is close to a 1-to-1 ratio, and the ratio of total damages to compensatory damages when the back and front pay is excluded is 2-to-1. In *Campbell* the Supreme Court allowed a much larger multiple on a $1 million compensatory award than the 2-to-1 multiple allowed here. The relationship between the total compensatory award of $2.2 million and the punitive damages is almost the 1-to-1 ratio mentioned in *Campbell* for the largest awards. Given the considerable leeway still allowed by the Supreme Court's due process standard ("we decline again to impose a bright-line ratio," *id.*), and the difficulty of quantifying deterrence, we find no rational basis to reverse the District Court. Its verdict is well within the standards for punitive damages allowed under both Tennessee and federal law. Although individual members of the panel might have awarded fewer punitive damages if acting as a trial judge, the standard of review for such awards is deferential and, absent legal error, does not allow us to substitute our judgment for that of the trial court.

## V. Award of Front Pay Until Retirement at Age 65

DuPont argues on appeal a factual proposition that Pollard would have retired at age 58 rather than age 65 and that the District Court was clearly erroneous in its finding that she would have continued to work until age 65. The District Court based its finding of front pay damages on retirement at age 65, increasing the damages for the additional seven years that she would have continued to work. DuPont does not argue on appeal that plaintiff was a malingerer or that she failed to mitigate her damages or that she should have accepted reinstatement to her job. DuPont argues simply that plaintiff had made a statement at the first trial that she might consider retirement at age 58 had she not been discharged.

The District Court's finding of fact on this issue is stated as follows:

> The Court will award front pay to Plaintiff through age 65 because the Court finds it is more likely that she would have retired at age 65 than at age 58. The Court found Plaintiff to be a credible witness throughout the original trial and the recent damages hearing. She testifies that she would have worked until she reached age 65.

> DuPont argued that during the 1997 trial, Plaintiff expressed a desire to work only until age 58. For Plaintiff, age 58 is significant because under DuPont's retirement plan the sum of her age and years of service would equal 85, which would make her eligible for a full pension. However, Plaintiff's hope of retiring at age 58 depended upon Plaintiff having amassed over one million dollars in her 401(k)

retirement savings count.  Given the market downturn of the last several years, her projected retirement savings have not materialized and her account presently contains approximately three hundred thousand dollars.  These recent economic conditions make it highly unlikely that she would have retired at age 58. Furthermore, Plaintiff testified that her husband is six years younger and would not have been able to retire at that time.

DuPont also argued that the average employee in the peroxide area retires prior to age 65.  (Tr. Ex. 22.)  However, the evidence presented during the hearing suggests that DuPont's statistics for peroxide employees actually includes former DuPont employees who did not really retire.  When DuPont sold its peroxide unit to Atofina, certain employees "retired" from DuPont, but continued to work for the peroxide unit now owned by Atofina.  These employees appear to have been included in DuPont's charts, making the charts less reliable representations of the operator retirement ages.

338 F. Supp. 2d at 879-80.

Pollard explained in considerable detail at the District Court hearing in July 2003 that she would have "remained [at DuPont] until I couldn't perform my duties any longer," and went into detail about her 401(K) plan and her need to work until age 65.  DuPont's own expert economist, Dr. Mary Baker, conceded that from the statistical chart offered by DuPont concerning retirement one could not tell when Pollard would have retired and that there was no certainty that Pollard would not have worked until age 65.

Based upon the testimony before the District Court, we cannot say that its finding on this issue is clearly erroneous.

### VI.  Cross-Appeal for Increased Punitive Damages

The only remaining issue before us arises from Pollard's cross-appeal in which she argues that the District Court should have awarded more punitive damages because (1) the award does not comply with the deterrent goals of Tennessee law in light of DuPont's "assets in excess of $34 billion," (2) she incurred substantial out-of-pocket expenses, (3) DuPont's "remedial efforts" came too late and that plant manager Wasilik's testimony was insincere and should not have been credited, and (4) the multiplier of compensatory damages into punitive damages was too low to deter future misconduct by DuPont.  We have previously recited in the discussion of punitive damages the broad authority of the District Court in determining the amount of damages that should be awarded in order to deter wrongful conduct.  We find no abuse of discretion in the District Court's treatment of punitive damages and hence do not believe that the plaintiff's cross-appeal is well taken.

Accordingly, the judgment of the District Court is affirmed.