Linda Rae CHANNON, Appellant,

v.

**UNITED PARCEL SERVICE, INC., Appellee,**

and

**Major Warner and John Douglas, Defendants.**

No. 99–0055.

Supreme Court of Iowa.

July 5, 2001.

Roxanne Barton Conlin and Tiffany B. Klosener of Roxanne Conlin & Associates, P.C., Des Moines, for appellant.

Kasey W. Kincaid of Faegre & Benson, L.L.P., Des Moines, for appellee.

LAVORATO, Chief Justice.

Linda Rae Channon appeals from a district court's posttrial ruling that imposed caps pursuant to 42 U.S.C. § 1981a on compensatory and punitive damages a jury awarded her against her employer United Parcel Service, Inc. (UPS) on her Title VII claims for sex discrimination and retaliation. UPS cross-appeals, contending the district court erred in not granting its motions for judgment notwithstanding the verdict and new trial on those claims and on Channon's federal equal pay claim based on insufficiency of the evidence. UPS also contends the district court should have awarded it a new trial because the court improperly admitted evidence of alleged acts of harassment. Finally, UPS contends the court should have awarded it a new trial because the discrimination and the retaliation compensatory damages award was not supported by the evidence and was excessive.

We affirm in part and reverse in part on the appeal and affirm on the cross-appeal. We remand with directions.

## I. Background Facts and Proceedings.

Following a jury trial on Channon's federal claims, the district court made findings of fact based on the same record as to Channon's claims under the Iowa Civil Rights Act (ICRA). *See generally* Iowa

Code Ch. 216 (1997). The state claims mirror the federal sex discrimination and retaliation claims. Because the district court's findings are supported by the record, we borrow extensively from them.

UPS is a multinational air and ground package delivery company. Its domestic operation is geographically divided into regions. Each region is divided into districts. Essentially, each state is a district (Iowa is the Iowa district). Districts are divided into divisions.

At the time of these proceedings, UPS was not a publicly owned corporation. Its employees owned all of the company's stock. Middle management compensation is determined, in part, by the number of units of UPS stock such management holds. Full-time supervisors are "one-unit managers." Managers are "two-unit managers." Staff-level managers like the district human resources manager, industrial engineering manager, and division managers are "three-unit managers." The district manager is also a three-unit manager. The district manager is the chief executive of the district. The district manager reports to a regional manager, who in turn reports to the officers of the company and its board of directors.

The package delivery industry is highly competitive. UPS employees make good money. Drivers can make $50,000 per year. Two-unit managers make about $80,000 per year. UPS employees work hard and are under pressure created by the need for on-time delivery. On the one hand, management-level employees compete with one another for positions within the company. On the other, they think of themselves as "partners" working together with an eye toward the bottom line.

The package delivery industry in general, and UPS in particular, is a traditionally male-oriented business. At UPS, managers work their way up through the ranks.

UPS managers come out of the male-dominated truck driving field. District managers determine promotional opportunities subjectively, following "people meetings" with staff-level managers.

UPS does not (1) provide job descriptions for management-level positions, (2) post vacancies, or (3) publish salary ranges. Employees do not apply for positions or promotions. Rather, people are chosen for advancement. The Iowa district manager keeps a "mental list" of employees, he thinks might match up well to certain positions. There is much lateral movement within the company. Because management employees are "partners," they usually go where UPS sends them.

At times material to this proceeding, most of the UPS senior managers were men. No women were members of the board of directors until 1996 when UPS created an appointment for an outside female director. Mike Clark was the district manager for the Iowa district. Clark had shown bias against women in management in the Iowa district, which bias UPS seems to have tolerated.

Channon began her employment with UPS in 1974 as a part-time preloader. The company promoted her to part-time supervisor in November 1978. Terry Plagman became Channon's manager on the preload in 1983. He encouraged her to "go driving" as a prerequisite for promotion to full-time management.

In 1985, Channon took a position as a package truck delivery driver. In June 1985, the company promoted Channon to full-time supervisor on the Des Moines preload.

Plagman left the Des Moines center in 1985. In 1986, Doug Wiley became the preload manager. Wiley and Channon made the Des Moines preload the top operation in the region. Wiley described

Channon as the best boxline operator in the region.

The company promoted Channon to preload manager in January 1988, after Wiley left. She operated the preload successfully without any full-time supervisors and achieved 100% production, the highest ever in the Des Moines preload.

In January 1989, Iowa district manager Emil Kuzman transferred Channon into industrial engineering (IE) for cross-training. Dan Gannon took over the preload. The company assigned Gannon one additional full-time supervisor and four or five additional part-time supervisors. Kuzman treated Channon fairly, recognized her talent, and groomed her for the division manager position. In 1991, Channon became a section leader in IE with multiple responsibilities in the package delivery division. Her section led the nation in industrial engineering operations.

In May 1993, Todd Galloway became the acting division manager. Clark became the Iowa district manager in September 1993, at which time Channon was still in IE as a section leader. In his testimony, Clark described Channon's position as the "office manager."

At the request of Galloway and Jeff Cox (the IE manager), Channon returned to manage the preload for peak-season 1993. She assumed her duties in this position on November 1, 1993.

On November 12, 1993, UPS driver Rich Olson accosted supervisor Randy Newman about supervisors doing union work. Olson paged Channon on the intercom. When Channon came on the boxline, she heard Olson shouting and screaming at Newman. She tried to intervene and calm the two down. Olson, however, was out of control. Olson turned on Channon, trapped her against the moving boxline, bumped his chest against her repeatedly,

and poked her in the breast twice. Olson's actions put Channon in physical danger from the moving boxline and frightened, humiliated, and angered her. Galloway talked to Olson while Channon was in the restroom crying. When Channon returned, she told Galloway and Olson that Olson's conduct was completely unacceptable.

Galloway sent Olson on his delivery route. When Olson returned, human resources district manager Major Warner terminated Olson's employment for using the intercom without permission and insubordination.

Olson filed a union grievance. Clark upheld the termination decision at the local level. Galloway told Channon not to "get weepy" about Olson's attack. He also told her not to miss work because it would harm the company's case against Olson if she were seen as "weak."

At this point, Channon sought psychological counseling through UPS's employee assistance program, "Solutions." The company sent Channon to Victoria Bruner, M.S.W., who began counseling Channon on November 18, for the aftermath of Olson's attack. Brunner continued to counsel Channon throughout the remainder of Channon's employment with UPS.

Pursuant to the union contract, Olson appealed his termination to a panel of three union and three management employees. John Douglas, John Rehling, and Jim Rottinghaus represented the company on the panel.

The panel heard the appeal on November 29. The panel reinstated Olson without back pay. Douglas and Rehling voted to return Olson to duty because Olson said he shook Channon's hand and apologized after the incident. The company did not allow Channon to rebut Olson's statement concerning the alleged apology. The panel

did not require Olson to stay away from Channon as a condition of returning to work.

Olson returned to work on December 20. Galloway told Olson to keep his contact with Channon "professional," but did not tell him to stay away from her. After his return, Olson and some of his fellow employees stared at Channon, followed her around the building, and generally tried to intimidate her.

Clark did not return Channon to IE after peak-season in November and December. Instead, he promoted Dan Hedberg, a one-unit supervisor, into that position. UPS gave Channon no explanation for Hedberg's promotion or for leaving her on the preload with continual exposure to Olson.

In January 1994, John Douglas became the Des Moines preload division manager. Immediately upon his arrival, Douglas began criticizing Channon. Douglas testified he was not requiring any more of Channon then he was requiring of his male managers. UPS documents indicate otherwise. Douglas gave the male managers elements, evaluations, and prorated MARS. Douglas gave Channon none of these.

In late January, Channon was paged to the West Center Office. When she arrived no one was there. When she turned to leave, Olson was blocking the doorway. When another manager came by, Olson left without comment. Olson's actions terrified Channon, who reported the incident to Warner and Douglas. The two males did nothing about Channon's complaint.

During Channon's service as preload manager, Douglas selectively documented his conversations with her. This was only five weeks after she began reporting to him. Douglas did not document his conversations with any other manager reporting to him. Douglas testified he docu-

mented these conversations with Channon because he thought he "might need them some day."

On March 3, the company audited the preload. Although the audit revealed that Channon was doing well on all objective measures, there were some problems on the preload, most of which were beyond her control. Scott Haas was the manager of feeder drivers, who were not arriving on time. The late arrivals disrupted the timing of the preload. UPS had also decided to accept packages weighing more than seventy pounds. The whole operation suffered losses. The midnight hub suffered higher losses, yet manager Joe Loken remained in that role through 1996. His job was not in jeopardy. Equipment for the Des Moines preload was old and unreliable.

Following the audit, Douglas decided to implement a new scanning plan and demanded Channon use the plan without ever consulting her about it. Douglas's plan failed, resulting in poor performance and discontinuation of his plan.

Throughout this time, Olson continued to stalk Channon. He was continuously bringing "grievances" to her and brought other workers with him. The grievances were not properly completed and did not conform to the union contract. Although Olson was the union steward, there was no reason for him to present grievances to Channon other than to harass her. Channon reported Olson's actions to Warner and Douglas. Neither of them took action against Olson.

In April, Warner and Douglas called Channon to a meeting with them. Douglas gave Channon six elements that she had to comply with in sixty days or face demotion. District manager Clark approved of Douglas's action. During this time Channon had been experiencing emotional distress due to Olson's attack, his

ongoing harassment of her, and Clark's and Douglas's failure to do anything about Olson's actions.

Channon tried to explain her problems to Douglas. His response was to (1) ridicule her, (2) call her "weak," and (3) speak to her in a high pitched voice, saying, "help me, help me." Additionally, Douglas suggested that Channon rip off Olson's face and that Olson should be coming to him to complain about her.

Shortly following this conversation, Channon took her vacation at Douglas's insistence. While Channon was gone, Douglas put Channon's other supervisors in charge of preload. During Channon's absence, the supervisors developed new plans and when she returned, Douglas told her to do what the supervisors said. Douglas's actions were nothing more than a blatant attempt to undermine Channon's authority. Although she was responsible for the results of her preload operation, she no longer had authority over that operation. Thereafter, production on her preload operation plummeted.

A friend informed Channon of the 180–day time limit for filing a complaint under the ICRA and encouraged her to contact an attorney. See Iowa Code § 216.15(12) ("A claim under this chapter shall not be maintained unless a complaint is filed with the commission within one hundred eighty days after the alleged discriminatory or unfair practice occurred."). On May 6, Channon consulted counsel. On May 10, 179 days from the November 12, 1993 incident involving Olson, Channon filed a complaint of sex discrimination and sexual harassment with the Iowa Civil Rights Commission.

During this time frame, Douglas was consulting with district manager Clark about Channon. Clark's only information about Channon came from Douglas and Warner, who misinformed Clark. As a result of the misinformation, Clark believed the Olson incident was Channon's fault. Clark believed Channon did not handle Olson's complaint properly, and he believed she had participated in the argument by raising her voice. He further believed that Channon should have walked away from Olson. Clark did not know (1) of Olson's assault, (2) that Olson had been stalking Channon in the workplace, and (3) that Douglas and Warner had not been responding to Channon's complaints about Olson's continuing misconduct. Clark made no independent investigation to determine the facts.

Because of the misinformation from Douglas and Warner, Channon "fell off [Clark's] mental list" for promotion. Clark blamed Channon for Olson's attack and for the problems in the preload. Clark decided that Douglas should remove Channon from the preload because of "poor performance."

Douglas and Warner called Channon in for another meeting on May 9. The meeting was only forty days from the April 4 meeting—not sixty days as Douglas had promised. Douglas testified it was "only coincidental" that the meeting occurred immediately after he and Clark learned of Channon's consultation with an attorney.

At this second meeting, Douglas told Channon that she was a terrible manager and that he could not understand how she ever became a UPS manager. He berated and belittled her for an hour. At the end of the meeting, Channon was transferred to the human resources department. She was not formally demoted because she remained a two-unit manager and continued to receive the same pay. Warner assigned Channon to work under compliance manager John Staebell, who was also a two-unit manager. At the time of her removal from the preload operation for "poor per-

formance," Channon had already accomplished four of the six elements that Douglas had imposed on her at the April 4 meeting.

Dan Gannon began his employment with UPS at the same time as Channon. UPS consistently paid Gannon more than it paid Channon for the same work. Gannon replaced Channon as the preload manager. According to Douglas, Warner, Clark, and Gannon himself, Gannon did a "fine job." After replacing Channon as the preload manager, Gannon received authorization for additional part-time supervisors, new scan equipment, and two managers to help him on the preload. Even with all this help, Gannon did not match Channon on any objective measure of preload performance.

From May 9 to December, Channon worked in the human resources department under Warner. On June 24, Warner met with Channon and talked about her sex discrimination and sexual harassment complaint. Warner told Channon that Douglas had never been accused of sexual harassment before, which was not true. Warner also told Channon she could be fired for knowing other employees' salaries. (At UPS, salaries are a closely guarded secret.) Warner acknowledged that Channon was doing a good job in her new assignment and gave her a raise of $150 per month. While in the human resources department, Channon learned her job quickly. In every aspect of her assignment, Iowa was ranked first in the region.

During her service in the human resources department, Channon was excluded from division meetings. She helped plan the national board of directors meeting held in Des Moines. Channon planned to attend one of the functions, but Warner assigned her out of town to train managers on the electronic hazmat. However, the manuals for the training program had not yet arrived, and some of the people she was supposed to train were attending the board meeting in Des Moines.

During the 1994 November and December peak season, Warner assigned Channon to work in Des Moines with Clyde Loehr. Without explanation, Warner reassigned Channon on November 29 to Burlington, Iowa, to work with center manager Gerry Wegman. During this time, Warner attended a meeting to determine Channon's fate with the company.

From January to May 1995, Channon was assigned to work on the special projects team under Douglas's supervision. Other than a male recovering from a heart attack, Channon was the only two-unit manager assigned to the special projects team. The other two-unit managers, all male, were assigned to work on the quality coordinator team, a more prestigious assignment and a stepping stone to higher management levels. In her work on the special projects team, Channon did the compliance manager's job while he was gone on vacation and objectively did an excellent job on both the special projects team and her compliance assignment.

Clark decided Channon had no "verticality" in IE. Although the company did not require an engineering degree for a district IE manager, Clark testified it is increasingly desirable. Channon did not have an engineering degree. Clark decided that Channon's future with UPS would be in operations.

On May 1, 1995, the company assigned Channon to work the midnight hub. Although the company did not formally demote Channon, it did put her in a one-unit supervisor's position with the same salary and benefits of a two-unit manager.

Channon reported to a two-unit manager on the midnight hub. The hub was somewhat like the preload, but Channon

had no previous hub experience. The company gave her no training. Channon taught herself from training manuals and by asking help from prior managers.

Clark testified that although Channon was being trained to take over as a hub manager, he never told her. Instead she was told that her supervisors "don't know what else to do with her."

UPS instituted a "buy-out" plan to downsize the management ranks. Clark announced the plan on May 31, 1995. When Clark came to the Iowa district, there were three women operations managers, including Channon. When he left, there were none. The two other women managers took the buy-out offer because they felt Clark had treated them unfairly.

Channon filed this lawsuit on June 9, 1995. She sued UPS, Olson, Warner and Douglas. She brought a civil rights and equal pay action based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1994), as amended by 42 U.S.C. § 1981a; the ICRA, Iowa Code chapter 216; and the Equal Pay Act, 29 U.S.C. § 206. She also brought common law claims of battery, assault and intentional infliction of emotional distress.

Shortly after Channon filed this lawsuit, John Staebell retired, leaving the compliance manager job vacant. Channon had the qualifications to replace him—she had the same title and reported to him previously. Whenever he was gone, Channon took over his job. Instead of giving the job to Channon, UPS gave the job to John Hindman, a male with no training and experience. Channon remained in a supervisor's position in the midnight hub. Hindman left the position two months later. The company replaced Hindman with another male, a one-unit supervisor. Channon remained in a supervisor's position in the midnight hub. When she took inactive status, the company promoted Rick Goecke to a two-unit manager's position and installed him as compliance manager.

While she was a supervisor in the midnight hub, Channon's employee relation index climbed from 56 to 82, the best improvement in the Iowa district.

Haas became the hub division manager in June 1995. From the beginning of his tenure, Haas excluded Channon from meetings and business communications. Haas did not invite Channon to the project change meeting that every other manager in the district, including one-unit supervisors, attended. Nevertheless, Channon's performance as a hub supervisor was excellent.

Goecke held the same position as Channon on the twilight sort. He was a one-unit supervisor. His job performance was marginal. He expected to be promoted to the manager of the twilight sort. Instead, Haas assigned Channon to that position on January 6, 1996. This was the first two-unit manager position she had held since Douglas and Warner had removed her from preload in May 1994.

Goecke was not happy when he did not get the promotion to twilight sort manager. However, Haas treated Goecke as though Goecke was the manager. Goecke refused to help Channon learn the twilight procedures. He ridiculed her efforts to clean up the language on the sort. He undermined her at every opportunity. Channon asked Haas to support her and correct Goecke's behavior, but Haas did not do so.

In a February 1996 meeting with part-time supervisors, Goecke called Channon a liar and screamed at her. Channon again asked Haas for help. Haas called Goecke and Channon into his office. Goecke told Channon he knew she had a lawsuit and "it made him sick." He accused her of taking

food off the table. He felt "partners" should work these things out. Haas declined to take sides. Haas was also angry that Channon had filed a lawsuit against her "partners," although he did not express his feelings to Channon. After Goecke left, Channon confided to Haas about her emotional health, telling him that she was "just hanging on by a thread," and was still having problems because of Olson's attack and UPS's subsequent treatment of her.

Later the same day, Goecke came to Channon and told her he was going to cooperate with her. However, the next day and nearly every day thereafter, Goecke said to her, "just hanging on by a thread, huh?"

On February 27, 1996, Channon visited Dr. Carey Wimer, a board-certified internist and her primary care physician. Dr. Wimer recommended that Channon stop working at UPS. Channon resisted her recommendation and returned to work. One day later, Goecke embarrassed her again.

Channon's last day of work at UPS was March 1, 1996. Two and one-half years after the Olson incident and UPS's subsequent actions against her, UPS finally succeeded in driving Channon out of the company.

Channon took advantage of UPS's salary continuation plan. She received a two-unit manager's salary for her first year off work. At the time of the trial, Channon was on inactive status as an employee of UPS. She did not plan to return to work at UPS and testified she would eventually seek employment elsewhere. However, her experience is not fully transferable to other industries. As a result, her earning capacity has been cut in half.

Channon suffers from post-traumatic stress disorder because of the Olson attack and UPS's actions towards her. Channon is mentally and emotionally unable to return to work at UPS.

Before trial, Channon and Olson, the defendant against whom her claims of assault and battery were directed, reached a settlement agreement. Because of the agreement, Channon withdrew the assault and battery claims. However, she presented evidence pertaining to those claims in support of her remaining claims.

The district court, by way of summary judgment, dismissed the Title VII claims against Olson, Warner, and Douglas. The court, also by way of summary judgment, dismissed the claim of intentional infliction of emotional distress against Olson, Warner, Douglas, and UPS.

Following a five-week trial, the jury reached a verdict in favor of Channon against UPS on her Title VII claims of sex discrimination and retaliation, awarding her compensatory and punitive damages. (The court submitted the case to the jury against UPS only.) The jury also awarded her compensatory damages on her equal pay claim. The jury, however, rejected her Title VII claim of sexual harassment. In a posttrial ruling, the district court imposed caps on the compensatory and punitive damages award pursuant to federal law. We set out additional facts relative to the caps in our discussion to follow.

As mentioned, the district court considered Channon's ICRA claims on the same evidence presented to the jury regarding her federal claims. The court awarded compensatory damages on the state claim against UPS. The court, however, dismissed the claims against Warner and Douglas. (The record is unclear as to why the court made no findings as to Olson.) We set out additional facts relative to these damages in our discussion to follow.

The district court denied UPS's motion for judgment notwithstanding the verdict and for new trial.

Channon appealed; UPS cross-appealed. Warner and Douglas, and Olson are not involved in either the appeal or cross-appeal.

## II. Issues on the Appeal.

Channon raises four issues on her appeal. She contends the district court erred in concluding that the award of front pay damages was subject to the damages cap imposed by 42 U.S.C. § 1981a. She additionally asserts that the district court erred in refusing to allocate compensatory damages under the ICRA and $300,000 in punitive damages under Title VII. She also contends the damages cap is unconstitutional. She lastly contends that the district court erred in dismissing her claim of tortious infliction of emotional distress on the basis that such claims are preempted by the ICRA.

## A. Front pay damages.

1. **Background.** Channon contends the district court erred in concluding that front pay constitutes "future pecuniary loss," subject to the compensatory damages cap imposed by 42 U.S.C. § 1981a(b)(3)(D). She asserts front pay is an equitable remedy exempt from the cap.

■ Because Channon's contention implicates the interpretation of federal statutes, our review is for correction of errors of law. *See Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 460 (Iowa 2000).

Channon's sex discrimination claim is premised on 42 U.S.C. § 2000e–2. That statute pertinently provides that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of em-

ployment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1).

That statute also pertinently provides that "[i]t shall be an unlawful employment practice for an employer ... to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(2).

Channon's retaliation claim is premised on 42 U.S.C. § 2000e–3. That statute pertinently provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

Section 102 of the Civil Rights Act of 1991, as codified at 42 U.S.C. § 1981a(a),

significantly expands the monetary relief potentially available to plaintiffs who would have been entitled to back pay under prior law. Before 1991, for example, monetary relief for a discriminatorily discharged employee generally included "only an amount equal to the wages the employee would have earned from the date of discharge to the date of reinstatement, along with lost fringe benefits such as vacation pay and pension benefits." *United States v. Burke*, 504 U.S. 229, 239, 112 S.Ct. 1867, 1873, 119 L.Ed.2d 34 (1992). Under § 102, however, a Title VII plaintiff who wins a back pay award may also seek compensatory damages for "future pecuniary

losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." [42 U.S.C. § 1981a(b)(3).] In addition, when it is shown that the employer acted "with malice or with reckless indifference to the [plaintiff's] federally protected rights," [42 U.S.C. § 1981a(b)(1)], a plaintiff may recover punitive damages.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 253–54, 114 S.Ct. 1483, 1491, 128 L.Ed.2d 229, 245 (1994).

However,

[42 U.S.C. § 1981a(b)(3)] imposes limits, varying with the size of the employer, on the amount of compensatory and punitive damages that may be awarded to an individual plaintiff. Thus, the sum of such damages awarded a plaintiff may not exceed $50,000 for employers with between 14 and 100 employees; $100,000 for employers with between 101 and 200 employees; $200,000 for employers with between 200 and 500 employees; and $300,000 for employers with more than 500 employees.

*Id.* at 254 n. 6, 114 S.Ct. at 1491 n. 6, 128 L.Ed.2d at 245 n. 6.

■ There is no dispute that $300,000 is the relevant cap in this case. *See* 42 U.S.C.A. § 1981a(b)(3)(D). The question is whether "front pay" damages fall within the term "future pecuniary damages" as used in 42 U.S.C. § 1981a(b)(3). If so, such damages would be subject to the $300,000 cap.

The term "front pay" is not found in the Civil Rights Act of 1964. However, courts have defined the concept to mean "the amount of pay the plaintiff would have received had [he or she] continued in [his or her] position after a judgment in [his or her] favor." Eileen Kuklis, Comment, *The Future of Front Pay Under the Civil Rights Act of 1991: Will it be Subject to the Damage Caps?* 60 Alb. L.Rev. 465, 468

(1996) [hereinafter Kuklis]; *see also Hudson v. Reno*, 130 F.3d 1193, 1203 (6th Cir.1997) (" 'Front pay' is widely defined as the salary that an employee would have received had he or she not been subjected to unlawful discrimination of his or her employer, subject to the employee's mitigating his or her damages.").

■ Front pay is a "form of relief that assumes the plaintiff would have continued in [his or her] position absent unlawful actions by the defendant." Kuklis at 469. The 1964 Act did not expressly provide for a damages award in the form of front pay. *Id; see* 42 U.S.C. § 2000e–5g. Nevertheless, before the enactment of 42 U.S.C. § 1981a, courts hearing Title VII actions "often awarded front pay, in lieu of reinstatement, where reinstatement was deemed inappropriate or merely delayed by the defendant and the award of back pay had failed to make the plaintiff 'whole.' " Kuklis at 469 (footnote omitted); *see Scarfo v. Cabletron Sys., Inc.*, 54 F.3d 931, 954 (1st Cir.1995) (holding that "[i]n a Title VII case, the court has discretion to award front pay from the date of judgment forward when reinstatement is impracticable or impossible").

In providing for front pay in Title VII cases, courts often treated the remedy as equitable in nature. In doing so, the courts have relied on 42 U.S.C. § 2000e–5(g)(1) (providing that the court may order reinstatement "or any other equitable relief as the court deems appropriate"). *See EEOC v. Gen. Lines, Inc.*, 865 F.2d 1555, 1561 (10th Cir.1989).

As mentioned, however, the Civil Rights Act of 1991 imposed a cap on recovery of "compensatory damages . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). Com-

pensatory damages awarded under the Act excludes "back pay, interest on back pay, *or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964* [42 U.S.C. § 2000e–5(g)]." 42 U.S.C. § 1981a(b)(2) (emphasis added).

In relevant part, § 706(g) provides:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include but is not limited to, reinstatement or hiring of employees, with or without back pay ... *or any other equitable relief as the court deems appropriate.*

42 U.S.C. § 2000e–5(g)(1)(A) (emphasis added).

**2. Analysis.** In deciding whether front pay is subject to the compensatory damages caps, the federal circuits which have decided the question present the issue this way: Is front pay "compensatory damages ... for future pecuniary losses" or is it "any other type of relief authorized under section 706(g)"—i.e., "any other equitable relief that the court deems appropriate?"

Here the district court held that front pay constituted "compensatory damages ... for future pecuniary losses" and therefore subject to the damages cap. We need not dwell on this issue because our holding on the allocation issue in division II.B of this opinion renders this issue moot. In addition, the United States Supreme Court has recently held that front pay is "any other type of relief authorized under section 706(g)" of the Civil Rights Act of 1964. *Pollard v. E.I. du Pont de Nemours & Co.,* — U.S. —, 121 S.Ct. 1946, 1952, — L.Ed.2d — (2001). Front pay, is therefore not subject to the damages cap, and

the district court erred in concluding otherwise. *Id.*

**B. Allocation.**

The jury reached a verdict in favor of Channon against UPS on her Title VII claims for sex discrimination and retaliation. The jury also reached a verdict in favor of Channon against UPS on her equal pay claim. The jury, however, rejected her Title VII claim of sexual harassment. On her Title VII claims, the jury awarded Channon damages as follows:

| | | |
|---|---|---|
| Past Medical Expenses | $ | 9,200 |
| Future Medical Expenses | | 1,620 |
| Back Pay | | 141,408 |
| Front Pay | | 245,644 |
| Past Emotional Distress | | 125,000 |
| Future Emotional Distress | | 5,000 |
| Total Compensatory Damages | $ | 527,872 |
| | | |
| Total Punitive Damages | | $80,220,000 |

On her equal pay claim, the jury awarded Channon $14,605.

On her state civil rights claim, the district court awarded Channon the same compensatory damages as the jury awarded on the Title VII claims, i.e., $527,872. The court did not award Channon punitive damages because under the state civil rights action, punitive damages are not allowed.

In a posttrial ruling, the district court concluded that because the compensatory damages award, including front pay, exceeded the $300,000 cap, the court could not enter judgment on the punitive damages award. The court then entered judgment on Channon's federal claims broken down as follows: $300,000 permitted by the cap; back pay in the amount of $141,408 (which is not subject to the cap); $9200 for past medical expenses (which is not subject to the cap); and $14,605 as liquidated damages pursuant to 29 U.S.C. § 216(b) (which is not subject to the cap), for a total of $465,213.

The court did not allow the $14,605 the jury awarded on the equal pay claim because that amount was already included in the back pay award. However, because the jury found UPS's conduct was willful, the court awarded Channon $14,605 as liquidated damages pursuant to 29 U.S.C. § 216(b).

In its posttrial ruling, the court ordered that "[p]ayment of the state law judgment shall satisfy the judgment on the verdict on the federal claims." Channon therefore ended up with a judgment of $527,872, the amount of the state judgment, and nothing for punitive damages. In an Iowa Rule of Civil Procedure 179(b) motion, Channon challenged the court's ruling. She contended that if the cap is imposed, "it should only be applied to the punitive damages award, and not to the compensatory damages awarded her on her state civil rights claim."

In ruling on Channon's motion, the court explained her position this way:

[P]laintiff contends she is entitled to uncapped damages in the amount of $527,872 under the Iowa Civil Rights Act and an additional $300,000 in punitive damages under Title VII. Plaintiff argues the Court's order imposes an artificial cap to damages under the Iowa Civil Rights Act, disregards its compensatory scheme and totally disregards the jury verdict. Plaintiff argues the court permitted the defendant to escape liability for punitive damages by subsuming the punitive damages in the state award of compensatory damages.

Plaintiff argues the Court should reallocate the jury verdict of compensatory damages for non-economic losses and future pecuniary losses to its award of damages under the Iowa Civil Rights Act and apply the statutory damage cap of section 1981a, not to non-economic losses and future pecuniary losses, but

only to the punitive damages award. In this way, Plaintiff can avoid the Congressional cap on compensatory damages. She can recover her compensatory damages under state law and her punitive damages under federal law.

The district court concluded that although some federal authority supported her position, other better-reasoned federal authority did not. The court determined that under the procedural circumstances of this case, Channon could not prevail on her claim to reallocate damages.

On appeal, Channon reasserts the position she took in the district court.

■ What we have here is not a true allocation case. Generally, allocation becomes necessary when the jury returns a general verdict on both state and federal claims without any allocation of the damages to those claims. The court is then left with the decision on how to allocate those damages to the claims. *See, e.g., Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 509 (9th Cir.2000) (holding that where jury returned general verdict and found for plaintiff under Title VII and under the state civil rights statute, district court had discretion to allocate all of the compensatory damages, front pay, and back pay to plaintiff's state law claim, while allocating punitive damages award to plaintiff's Title VII claim). Allocation may also be necessary where the jury has by special verdict awarded damages on each claim, under identical legal standards and instructions, but the compensatory damages on the federal claim are above the caps. *See, e.g., Martini v. Fed. Nat'l Mortgage Assn'n,* 178 F.3d 1336, 1349 (D.C.Cir.1999), *cert dismissed,* 528 U.S. 1147, 120 S.Ct. 1155, 145 L.Ed.2d 1065 (2000) (holding that where jury allocated damages under the

Title VII claim and the state civil rights claim and damages on the Title VII claim exceeded the cap, the district court should have reallocated those damages to the state claim).

■ Here, no allocation is necessary because the elements for the compensatory damage award and the amount awarded for each of those elements were the same for both the Title VII claims and the ICRA claims. Duplication of damages, however, is an issue. *See Team Central, Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 925 (Iowa 1978) (noting that "[t]he purpose of damages is to restore an injured party to the position he enjoyed before his injury," and that therefore "[d]uplicate or overlapping damages are to be avoided"). To avoid such duplication, we need only recognize the compensatory damages awarded on the ICRA claims and ignore the compensatory damages award on the Title VII claims. What the district court ruled was that payment of the judgment on the state claims satisfies the judgment for *all* damages—*including* punitive damages on the federal claims. Because the ICRA does not permit punitive damages, the district court awarded no such damages. Therefore, there was no need to avoid duplication of punitive damages.

Doing what the district court did effectively limits our prerogative to provide greater remedies under our civil rights statute than those available under Title VII. *See Martini*, 178 F.3d at 1349–50. This result would be contrary to the express terms of Title VII: "Nothing in [Title VII] shall be deemed to exempt or relieve any person from liability, duty, penalty, or punishment provided by any present or future law of any State . . . ." 42 U.S.C. § 2000e–7; *see Martini*, 178 F.3d at 1350; *see also Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 576 (8th Cir. 1997) (holding that Title VII damages cap

does not apply to discrimination claims under state law). And, as the court in *Martini* observed, "[o]ther than traditional judicial authority to reduce damages due to excessiveness, the power to limit total damages in cases where plaintiffs sue under both federal and local law belongs to Congress and [the state legislature] not this court." *Martini*, 178 F.3d at 1350.

Finally, we agree with the Second Circuit's preference for permitting a plaintiff to recover under the liability theory that provides the plaintiff the most complete recovery. *See Magee v. United States Lines, Inc.*, 976 F.2d 821, 822 (2d Cir. 1992). This preference is consistent with our goal of damages in civil cases: "to place the injured party in as favorable a position as though no wrong had occurred." *See R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 421 (Iowa 1983).

The federal case the district court primarily relied on in refusing Channon's request for allocation was *Martini v. Federal National Mortgage Association*, 977 F.Supp. 464 (D.D.C.1997). We note, however, that in that case, the appellate court rejected the federal district court's analysis refusing allocation in favor of permitting allocation. *Martini*, 178 F.3d at 1349–50.

We conclude Channon is entitled to judgment against UPS for the uncapped damages in the amount of $527,872 under the ICRA and for an additional $300,000 in capped punitive damages under Title VII. (The jury awarded $80,220,000 in punitive damages.) The district court erred in concluding otherwise. In addition, Channon is entitled to $14,605 as liquidated damages pursuant to 29 U.S.C. § 216(b) because such damages are not subject to the cap.

## C. Constitutional claims.

Channon next contends that the $300,000 damages cap imposed by 42

U.S.C. § 1981a(b)(3)(D) is unconstitutional. She asserts the cap violates (1) her right to a jury trial under the Seventh Amendment to the Federal Constitution, (2) the separation of powers doctrine under Article III of the Federal Constitution, (3) her right to equal protection of the laws, and (4) her right to due process. The district court rejected those arguments in a posttrial ruling and for reasons that follow, so do we.

**1. Scope of review.** We recently summarized our scope of review as to constitutional issues in *In re Morrow:*

> This court reviews constitutional claims de novo. Statutes are cloaked with a strong presumption of constitutionality and, thus, a party challenging a statute "carries a heavy burden" of rebutting this presumption. " 'A person challenging a statute must negate every reasonable basis upon which the statute could be upheld as constitutional.' "

616 N.W.2d 544, 547 (Iowa 2000) (citations omitted).

**2. Seventh Amendment.** Channon argues that the damages cap violates her Seventh Amendment right to a jury trial because the cap effectively "vetoes" any jury award of compensatory and punitive damages in excess of $300,000.

The Seventh Amendment to the Federal Constitution provides:

> In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in *any Court of the United States*, than according to the rules of the common law.

U.S. Const. amend. VII (emphasis added).

Among other reasons, the district court rejected Channon's Seventh Amendment claim on the ground that the Seventh Amendment governs proceedings only in federal courts and not in state courts. We agree.

Channon goes to great lengths to show how the cap violates the Seventh Amendment. However, she does little to challenge the district court's ruling regarding the applicability of that constitutional provision. Her only argument is that *Gasperini v. Center for Humanities,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), which the district court relied on, does not squarely answer the question.

In *Gasperini,* the Supreme Court stated:

> *The Seventh Amendment, which governs proceedings in federal court, but not in state court,* bears not only on the allocation of trial functions between judge and jury . . . ; it also controls the allocation of authority to review verdicts, the issue of concern here.

518 U.S. at 432, 116 S.Ct. at 2222, 135 L.Ed.2d at 677 (emphasis added). The language makes clear the Supreme Court's position that the Seventh Amendment does not apply to proceedings in state court.

Nevertheless, Channon argues this language is dictum. To whatever extent this may be true, prior Supreme Court precedent, including the precedent relied upon by the Supreme Court in making the above statement, supports the conclusion that the Seventh Amendment does not apply to state court proceedings. *See, e.g., Pearson v. Yewdall,* 5 Otto 289, 95 U.S. 294, 296, 24 L.Ed. 436, 437 (1877) ("We have held over and over again that art. 7 of the amendments to the Constitution of the United States relating to trials by jury applies only to the courts of the United States . . . ."); *Edwards v. Elliott,* 21 Wall. (88 U.S.) 532, 557, 22 L.Ed. 487, 492 (1874); *see also Elliott v. City of Wheat Ridge,* 49 F.3d 1458, 1459 (10th Cir.1995);

*In re Jacobs,* 44 F.3d 84, 89 (2d Cir.1994); *Mattison v. Dallas Carrier Corp.,* 947 F.2d 95, 99 & n. 1 (4th Cir.1991).

Additionally, as UPS points out, there is Supreme Court precedent for the very type of issue before us. In *Minneapolis & St. Louis Railroad v. Bombolis,* the Supreme Court had before it state constitutional and statutory law which provided that "after a case has been under submission to a jury for a period of twelve hours without a unanimous verdict, five sixths of the jury are authorized to reach a verdict, which is entitled to the legal effect of a unanimous verdict at common law." 241 U.S. 211, 216, 36 S.Ct. 595, 596, 60 L.Ed. 961, 963 (1916). The issue was whether applying this law to a cause of action under the federal Employers' Liability Act brought in state court violated the Seventh Amendment. *Id.* The Supreme Court held that the Seventh Amendment requirement of a unanimous verdict as mandated by prior judicial decision did not control state court enforcement of federal law. *See generally id.* at 216–23, 36 S.Ct. at 596–99, 60 L.Ed. at 963–65. In reaching this conclusion, the Court again recognized that the Seventh Amendment applies only to federal court proceedings and not to state court proceedings. *Id.* at 217, 36 S.Ct. at 596, 60 L.Ed. at 963.

The importance of this case to the proceeding before us is obvious: not only is the Seventh Amendment inapplicable to state court proceedings brought under state law, but it is also inapplicable to state court proceedings brought under federal law—the very situation we have here. The Fifth Circuit similarly has held that the Seventh Amendment right to a jury trial in common-law actions does not apply to a case in state court, even though the claims are based on federal law, i.e. the Jones Act. *See Linton v. Great Lakes*

*Dredge & Dock,* 964 F.2d 1480, 1488–89 n. 16 (5th Cir.1992).

In the present case, the district court wisely observed that

[p]erhaps the reason for the United States Supreme Court's consistency regarding the application of the Seventh Amendment only to federal courts stems from the clear language of the Seventh Amendment, which states "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in *any Court of the United States,* than according to the rules of common law."

Because we hold that the Seventh Amendment does not apply here, we do not reach the question whether the $300,000 damages cap imposed by 42 U.S.C. § 1981a(b)(3)(D) violates the Seventh Amendment.

■ **3. Separation of powers.** Channon also contends that the damages cap infringes on the doctrine of separation of powers guaranteed by Article III of the Federal Constitution. She concedes that "Congress has the power to decide which remedies are available for violations of a statute." However, she argues that while Congress has the power to limit the types of remedies, it has no power to limit the amount awarded. Specifically, she argues, the damages cap violates the separation of powers doctrine "by undercutting the power and obligation of the judiciary to reduce an excessive verdict, based on the facts of a specific case."

■ Article III, section 1 of the Federal Constitution begins by stating that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior courts as the Congress may from time to time ordain and estab-

lish." U.S. Const. art. III, § 1. The separation of powers doctrine derives from Article III and requires that each of the three branches of the federal government remain "entirely free from the control or coercive influence, direct or indirect, of either of the others...." *Humprey's Ex'r v. United States,* 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611, 1620 (1935); *accord Mistretta v. United States,* 488 U.S. 361, 380, 109 S.Ct. 647, 659, 102 L.Ed.2d 714, 736 (1989). The three branches of government, however, need not "be entirely separate and distinct." *Mistretta,* 488 U.S. at 380, 109 S.Ct. at 659, 102 L.Ed.2d at 736. Rather, the three branches of government have "a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" *Id.* at 381, 109 S.Ct. at 659, 102 L.Ed.2d at 736 (quoting *Buckley v. Valeo,* 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659, 746 (1976)).

The separation-of-powers jurisprudence grew out of the concern over the "encroachment and aggrandizement" of one branch at the expense of another. *Id.* at 382, 109 S.Ct. at 660, 102 L.Ed.2d at 737. For this reason, the Supreme Court has struck down "provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." *Id.* "By the same token, [the Supreme Court] ha[s] upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment." *Id.*

To that end, separation-of-powers jurisprudence has consistently recognized that when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies.... Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created.

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 83, 102 S.Ct. 2858, 2878, 73 L.Ed.2d 598, 623 (1982) (plurality opinion).

In passing the 1991 amendments to Title VII, Congress permitted additional remedies in the form of compensatory and punitive damages but then decided to limit the available damages awarded based on the size of the employer. Channon does not dispute the power of Congress to designate the type of remedy, but rather disputes the power of Congress to designate the amount of damages to be awarded.

In rejecting a similar argument, the Sixth Circuit said:

Plaintiff cross-appeals on the basis that the statutory cap on compensatory damages found at 42 U.S.C. § 1981a is an unconstitutional violation of the Separation of Powers doctrine. Plaintiff argues that by creating the statutory cap, Congress impermissibly encroached upon the judiciary and its "traditional responsibility" for assuring against excessive verdicts on a case-by-case basis. We do not find this argument persuasive. Congress created Title VII, and Congress may designate the remedies under Title VII. The fact that the judicial branch is limited in the amount of damages which it may award does not mean its ability to decide cases is being impaired by Congress.

*Pollard v. E.I. du Pont de Nemours & Co.,* 213 F.3d 933, 945–46 (6th Cir.2000), *rev'd on other grounds,* — U.S. —, 121 S.Ct. at 1952, — L.Ed.2d — (citation omitted); *see also Dobrich v. Gen. Dynamics*

*Corp.,* 106 F.Supp.2d 386, 396 (D.Conn. 2000).

We agree with this analysis and conclude that Congress, in enacting 42 U.S.C. § 1981a(b)(3)(D), has not violated the separation of powers doctrine under Article III of the Federal Constitution. Under these circumstances, the damages cap does not threaten "encroachment or aggrandizement" by Congress at the expense of the judiciary. As the district court determined here, "[s]ince the statute does not unduly infringe on the province of the judiciary but instead expresses the will of Congress with respect to available statutory remedies under Title VII, no constitutional infirmity exists."

■■■ **4. Equal protection.** Channon argues that 42 U.S.C. § 1981a gives women the right to recover compensatory and punitive damages when they suffer intentional discrimination on the job, but limits the amount of recovery. On the other hand, she argues, victims of discrimination on the basis of race or national origin are permitted to recover damages under 42 U.S.C. § 1981 without any upper limit. For this reason she argues that the damages cap imposed by 42 U.S.C. § 1981a(b)(3)(D) violates her right to equal protection.

At the outset, we note Channon does not specify which equal protection provision she meant to invoke—the one found in the Fourteenth Amendment or the implied equal protection clause inherent in the Due Process Clause of the Fifth Amendment to the Federal Constitution. Because the statute at issue is a federal one, we assume she meant the Fifth Amendment, which is applicable to the federal government. *See Pollard,* 213 F.3d at 946. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without

due process of law." U.S. Const. amend. V.

The equal protection clause requires that similarly-situated persons be treated alike. *Morrow,* 616 N.W.2d at 548. "If people are not similarly situated, their dissimilar treatment does not violate equal protection." *Id.*

In *Pollard,* the Sixth Circuit rejected the same argument that Channon raises here. 213 F.3d at 946. The court did so concluding that plaintiffs bringing a claim under 42 U.S.C. § 1981a are not similarly situated with 42 U.S.C. § 1981 claimants. *Id.* In reaching this conclusion, the court reasoned:

> Plaintiff also argues that the statutory damages provision also violates the Equal Protection Clause of [the Fifth Amendment] in that it unfairly discriminates among those persons who wish to vindicate their rights with respect to racial discrimination and those who wish to vindicate their rights with respect to gender discrimination....
>
> 42 U.S.C. § 1981a places a $300,000 statutory cap on all intentional discrimination on the basis of race, national origin, sex, religion, or disability (as defined in the Americans with Disabilities Act). The statute is inherently equitable on its face. The difference in the application of this statute in situations of gender or race discrimination occurs due to a provision in the Act which states that nothing in section 1981a is to be construed as in any way limiting the remedies provided in section 1981 itself, which does not limit recovery for intentional discrimination based upon race or national origin. However, section 1981 provides relief for a different type of claim than encompassed by the remedies available to plaintiff in section 1981a. *Section 1981 provides for relief from discrimination in the making and en-*

*forcing of contracts, while section 1981a provides for relief purely from intentional discrimination in the employment context. While section 1981 includes contracts for employment, it also includes contracts for admission to organizations, insurance and other business contracts with private persons or corporations, and admission to schools. Plaintiff cannot therefore be said to be "similarly situated" with section 1981 claimants.*

*Id.* (Emphasis added.)

Based on the same reasoning, we conclude Channon is not "similarly situated" with section 1981 claimants. Her equal protection challenge must therefore fail. The district court was correct in rejecting this challenge.

**5. Due process.** As to her final constitutional challenge, Channon contends that the damages cap violates her guarantees of due process. As with her equal protection challenge, Channon does not specify whether she is making a due process challenge under the Fourteenth Amendment or the Fifth Amendment to the Federal Constitution. The Fourteenth Amendment prohibits *states* from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. As mentioned, the Fifth Amendment prohibits the *federal government* from "depriv[ing] a person of life, liberty, or property without due process of law." U.S. Const. amend. V. Because Channon challenges a federal statute, her challenge implicates the Fifth rather than the Fourteenth Amendment.

Channon relies on one case to support her position: *Morris v. Savoy,* 61 Ohio St.3d 684, 691, 576 N.E.2d 765, 771 (1991). In that case, the Ohio Supreme Court held that a state statutory cap on damages for medical malpractice violated a state constitutional due process provision. The

court's rationale was that the statute was unreasonable and arbitrary because it imposed the costs of the intended benefit of the statute to the general public solely upon the class consisting of those most severely injured by medical malpractice. Channon asserts we can use the identical rationale regarding the damages cap here.

The district court rejected this argument and so do we. As the district court properly pointed out, the Ohio Supreme Court was interpreting its own constitution. The court had every right to accord Ohio citizens more rights under the Ohio Constitution than such citizens were entitled under the Federal Constitution.

Additionally, as the district court noted, Channon cites no authority supporting her contention that 42 U.S.C. § 1981a(b)(3)(D) violates the Due Process Clause of the Fifth Amendment. Channon has the burden to establish her due process claim by showing that Congress acted in an arbitrary and irrational manner. *See Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 83, 98 S.Ct. 2620, 2636, 57 L.Ed.2d 595, 618 (1978). She has not met that burden.

In rejecting the argument that Congress had no rational basis for enacting the damages cap, the Sixth Circuit explained:

In a political compromise, the Civil Rights Act of 1991 was limited in the remedies which it would provide due to a belief that unlimited damages for all forms of discrimination would force employers to institute hiring quotas for their own economic safety. *See* 137 Cong. Rec. S15472–01 (discussing the fear of quotas that drove the compromise which was reached in the Civil Rights Act of 1991). The adoption of the provision saving the remedies available under section 1981 was rationally related to the legitimate purpose of cre-

ating reasonable damages available to all other victims of intentional discrimination without being forced to limit the damages already available to victims of racial and ethnic discrimination.

*Pollard,* 213 F.3d at 946.

What we have here is "a classic example of an economic regulation—a legislative effort to structure and accommodate 'the burdens and benefits of economic life.'" *Duke,* 438 U.S. at 83, 98 S.Ct. at 2635, 57 L.Ed.2d at 618 (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752, 766 (1976)). The Supreme Court has previously held similar types of legislation motivated by similar concerns do not violate the due process protections afforded by the Fifth Amendment. *See Duke,* 438 U.S. at 84–87, 98 S.Ct. at 2636–2637, 57 L.Ed.2d at 618–20 (holding that cap on liability for nuclear accidents did not violate Fifth Amendment due process as arbitrary or irrational).

We conclude, as did the district court, that the damages cap found at 42 U.S.C. § 1981a(b)(3)(D) does not violate the Fifth Amendment due process requirements.

### D. Intentional infliction of emotional distress.

Finally, Channon contends that the district court erred in sustaining UPS's motion for summary judgment, dismissing her claim of tortious infliction of emotional distress. She argues this court's decision in *Greenland v. Fairtron,* 500 N.W.2d 36 (1993), which the district court relied on in dismissing her claim, is flawed and we should revisit it. She asserts in the alternative that even if *Greenland* is good law, it does not require dismissal of her emotional distress claim.

1. **Scope of Review.** We review a ruling granting a motion for summary judgment for correction of errors at law.

*Knudson v. City of Decorah,* 622 N.W.2d 42, 48 (Iowa 2000). Summary judgment is proper when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

Iowa R. Civ. P. 237(c).

2. **Greenland.** In *Greenland v. Fairtron Corp.,* we held that the ICRA, Iowa Code chapter 216 (formerly chapter 601A), provides the exclusive remedy for particular conduct prohibited under that statute. 500 N.W.2d 36, 38 (Iowa 1993). "Preemption occurs unless the claims are separate and independent, and therefore incidental, causes of action." *Id.* If, under the facts of the case, success on the non-ICRA claims requires proof of discrimination, such claims are not separate and independent. *Id.* "The test is whether, in light of the pleadings, discrimination is made an element of" the non-ICRA claims.

Channon asserts we improperly decided *Greenland* because we relied on inaccurate characterizations of a prior holding in *Northrup v. Farmland Industries, Inc.,* 372 N.W.2d 193 (Iowa 1985). She asserts that *Northrup* does not stand for the proposition that the ICRA preempted a claim of tortious infliction of emotional distress. Rather, she argues, in *Northrup* this court actually recognized the claim and upheld its dismissal only because the conduct alleged was not sufficiently outrageous.

We agree with UPS that under the doctrine of stare decisis there is a preference for upholding prior decisions of this court. *See Miller v. Westfield Ins. Co.,* 606 N.W.2d 301, 306 (Iowa 2000). However, "stare decisis does not prevent the court from reconsidering, repairing,

correcting or abandoning past judicial announcements when error is manifest, including error in the interpretation of statutory enactments." *Id.*

Here, we see no reason to revisit our holding in *Greenland.* We think the conclusion this court reached in *Greenland* is a correct interpretation and application of the ICRA.

Additionally, we disagree with Channon's assessment that *Greenland* is inconsistent with *Northrup.* In the latter case, this court stated "that the procedure under the civil rights act is exclusive, and a claimant asserting a discriminatory practice must pursue the remedy provided by the act." *Northrup,* 372 N.W.2d at 197. Several cases have since held the same. *See, e.g., Borschel v. City of Perry,* 512 N.W.2d 565, 567–68 (Iowa 1994) (holding that civil rights statute preempts claim of wrongful discharge in violation of public policy when the claim is premised on discriminatory acts); *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 639 (Iowa 1990) (holding that civil rights statute preempted claims of wrongful discharge, unfair employment practices, and termination in bad faith and actual malice because all were premised on religious discrimination); *Hamilton v. First Baptist Elderly Hous. Found.,* 436 N.W.2d 336, 341 (Iowa 1989) (concluding that *Northrup* held that the civil rights statute preempts independent common law actions also premised on discrimination).

Finally, in *Greenland,* we addressed the apparent inconsistency Channon now raises between our *Greenland* and *Northrup* decisions:

> Contrary to Greenland's contention, our decisions in *Vaughn* and *Northrup* did not implicitly allow separate claims for intentional infliction of emotional distress in conjunction with chapter 601A discrimination claims. Preemption of

the emotional distress claims was never raised or considered in either appeal. 500 N.W.2d at 38.

**3. Did the district court err in its application of *Greenland?*** Channon's fallback position is that the district court erred in ruling that the ICRA preempted her emotional distress claim. For reasons that follow, we disagree.

As mentioned, the ICRA preempts her emotional distress claim if "in light of the pleadings, discrimination is made an element of" such claim. *Greenland,* 500 N.W.2d at 38. Therefore, the key is Channon's characterization of her emotional distress claim as stated in her pleadings.

In her petition, Channon alleges that "UPS discriminated against [her] with respect to the conditions of her employment, benefits and advancements on the basis of her sex and have subjected [her] to continual sexual harassment and have allowed a sexually hostile and offensive work atmosphere to exist at [her] place of employment and have retaliated against her for her complaints about discrimination and harassment." Additionally, she alleges that UPS's "conduct includes, but is not limited to unwelcome sexual advances, verbal and physical conduct of a sexual nature and differential treatment based on sex."

In her emotional distress claim, Channon incorporates these allegations and others, all of which pertain to her Title VII, ICRA, and equal pay claims. We agree with the district court that Channon's pleadings clearly establish that the operative facts which she alleges give rise to her claims under the ICRA are the same as those upon which she relies as giving rise to her emotional distress claim. In short, her emotional distress claim is based on her allegations of discrimination. The ICRA therefore preempts her claim, and the district court was correct in so ruling.

■ **E. Punitive damages.** UPS argues that even if the damages cap is unconstitutional as Channon contends, we must still set aside the punitive damages award for two reasons. First, UPS contends that Channon failed to prove malice or reckless indifference to support her award for punitive damages. Second, UPS contends that the award of punitive damages cannot be upheld against it on a vicarious basis because it made a good-faith effort to prevent discrimination in the work place. We reject both challenges because UPS did not raise those issues with the district court in its motion for directed verdict.

## III. Cross Appeal.

In its cross-appeal, UPS contends the district court erred in overruling its motions for judgment notwithstanding the verdict and new trial. In support of its contention regarding its motion for judgment notwithstanding the verdict, UPS argues that Channon failed to prove her sex discrimination, retaliation, and equal pay claims.

UPS asserts alternatively that the district court erred in refusing to grant its motion for new trial because Channon failed to prove these claims. In short, UPS claims that at a minimum, the court should have granted it a new trial. Additionally, in support of its contention for new trial, UPS argues that (1) the evidence concerning alleged acts of harassment and discrimination directed at Channon during her employment tenure was improperly admitted, and (2) the compensatory damages award is not supported by the evidence and is excessive.

### A. Scope of review.

■ A motion for judgment notwithstanding the verdict must stand or fall on the grounds asserted in the motion for directed verdict. *Schlegel v. Ottumwa,* 585 N.W.2d 217, 221 (Iowa 1998). Appellate review is limited to those grounds. *Id.*

We review a district court's ruling on a motion for judgment notwithstanding the verdict for correction of errors at law. Iowa R.App. P. 4; *Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 391 (Iowa 2001).

■ We inquire whether substantial evidence exists to support the plaintiff's claim, justifying submission of the case to the jury. *Gibson,* 621 N.W.2d at 391. In making this determination, we view the evidence in the light most favorable to the nonmoving party. Iowa R.App.P. 14(f)(2); *Gibson,* 621 N.W.2d at 391.

■ The scope of our review of a district court's ruling on a motion for new trial depends on the grounds raised in the motion. *Roling v. Daily,* 596 N.W.2d 72, 76 (Iowa 1999). "To the extent the motion is based on a discretionary ground, we review it for an abuse of discretion. But if the motion is based on a legal question, our review is on error." *Id.*

■ "We find such an abuse when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Schettler v. Iowa Dist. Ct.,* 509 N.W.2d 459, 464 (Iowa 1993). As used in this context, " '[u]nreasonable' means not based on substantial evidence." *Id.*

As mentioned UPS contends the district court erred in overruling its motions for judgment notwithstanding the verdict and for new trial because Channon failed to prove her equal pay, sex discrimination, and retaliation claims. For reasons that follow, we disagree.

### B. Equal pay claim.

The Equal Pay Act prohibits employment discrimination based on sex:

No employer having employees subject to any provisions of this section shall discriminate ... between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . .

29 U.S.C. § 206(d)(1).

The equal work standard does not require that compared jobs be identical, only that they be substantially similar. EEOC The Equal Pay Act, 29 C.F.R. § 1620.13(a) (2000). A plaintiff may make a prima facie case by comparing the plaintiff's salary to that of a predecessor or successor. EEOC The Equal Pay Act, 29 C.F.R. § 1620.13(b)(2), (4), (5).

■■■■ To establish a prima facie case, a plaintiff has to prove that the plaintiff was a member of a protected class, in this case a female, and that the job she occupied was similar to higher paying jobs occupied by males. *See Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir.1994). Once a prima facie case is established, a presumption of discrimination arises. *Id.* at 344. The burdens of production *and* persuasion then shift to the defendant " 'to show, by a preponderance of the evidence, that the wage differential resulted from one of the allowable causes enumerated by the statute.' " *Id.* at 345 (quoting *Fowler v. Land Mgmt. Groupe*, 978 F.2d 158, 161 (4th Cir.1992)). The defendant must prove one of four

affirmative defenses to avoid liability. 29 U.S.C. § 206(d)(1). If the defendant fails to prove such a defense, the jury must return a verdict in favor of the plaintiff. *See Brinkley–Obu*, 36 F.3d at 344.

■■■■ In its motion for directed verdict, UPS did not contend that Channon had failed to prove a prima facie case. UPS's only claim was that it had proved, as a matter of law, its affirmative defense that there were other explanations in the evidence to explain any alleged salary discrepancy. As to this affirmative defense, the district court instructed the jury that UPS was claiming that any higher pay differentials paid to male employees were made pursuant to a merit system that was not based upon an employee's sex, or a differential based upon any factor other than sex.

To establish the existence of a merit system, the court instructed the jury that UPS had to prove that (1) it used an organized and structured procedure whereby Channon was evaluated in a systematic manner according to predetermined criteria and (2) it could show a system of advancement or reward for merit.

To establish that the pay differential was based on "a factor other than sex," the court instructed the jury that UPS had to prove the gender-neutral factor was adopted for a legitimate business reason.

The jury filed special verdict forms finding that (1) Channon had proved the elements of her equal pay claim and (2) UPS had failed to prove its defenses that any higher pay differentials paid to male employees were made pursuant to a merit system or factors other than sex.

Channon compared herself to co-employee Dan Gannon. Channon and Gannon held the same positions during the relevant time period, the three-year period

preceding June 9, 1995 (the date Channon filed her lawsuit). During this time period, UPS paid Gannon $11,659 more than it paid Channon. Interest on the overpayment amounted to $2,946. The two figures added together total $14,605, the amount the jury awarded Channon on her equal pay claim.

An economist expert made a study of salaries paid to UPS managers—male and female—which showed that female managers were consistently paid less than male managers. This study included Channon and Gannon. The expert testified that in her opinion the differential in pay was sex-based.

Nothwithstanding this evidence, UPS insists that the pay differential was due to the fact that Gannon had been a manager at UPS for a longer period than Channon.

The problem with this argument is that it is fact-driven, and it is a rare case when a party proves its defense as a matter of law. The jury did not have to believe that the pay differential was due to the fact that Gannon had been a manager at UPS for a longer period than Channon. It could, for example, believe that the pay differential was due to sex discrimination. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312 (2d Cir.1995) (reversing the dismissal of plaintiff's equal pay claim where employer failed to prove that a male employee's higher salary was due to previous experience and that this experience was a job-related qualification for the position in question).

Additionally, the jury could find from the evidence that Gannon's length of service created no difference in work responsibilities that could justify the difference in pay. *See Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 522, 526 (2d Cir.1992) (holding that factor other than sex that creates pay differential between men and women performing the same job must be

rooted in legitimate business-related differences in work responsibilities and qualifications for the particular positions at issue). And the jury could find under the evidence that UPS had no plan and no system for compensation that would constitute an exception to the Equal Pay Act.

■ For all these reasons, we reject UPS's contention that Channon failed to prove her equal pay claim. We likewise reject UPS's contention that none of the evidence presented at trial could properly support a finding of a willful violation of the Equal Pay Act. We do so because UPS never raised the issue with the district court in its motion for directed verdict.

### C. Sex discrimination/retaliation.

UPS contends that the district court erred in refusing to grant its motion for judgment notwithstanding the verdict on Channon's sex discrimination and retaliation claims. UPS further contends that at a minimum the district court should have granted its motion for a new trial.

In its marshalling instruction on Channon's sex discrimination claim, the district court instructed the jury that Channon had to prove that (1) on or after November 12, 1993 (the date of Olson's attack), UPS took adverse employment action against her and (2) Channon's sex was a motivating factor in UPS's decision. These are the elements of a Title VII sex discrimination claim. *See Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999).

In its marshalling instruction on Channon's retaliation claim, the district court instructed the jury that Channon had to prove that (1) she engaged in activity protected under the civil rights law, (2) UPS took adverse employment action against her, and (3) there was a causal connection between her participation in the protected

activity and the adverse employment action taken. These are the elements of a retaliation claim. *See* 42 U.S.C. § 2000e–3(a); *Manning v. Metro. Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997) ("To prevail on a retaliation claim brought under Title VII, 42 U.S.C. § 2000e–3(a), an employee must show that (1) she filed a charge of discrimination; (2) the employer subsequently took adverse employment action against her; and (3) the adverse action was causally linked to the filing of the charge of discrimination.")

We note that retaliation may occur even though the employee has not filed a "formal complaint." *See Graham v. Texasgulf, Inc.,* 662 F.Supp. 1451, 1462 (D.Conn.1987) ("The protection afforded by Title VII against retaliation ... is not limited to individuals who have filed formal complaints ...."); *see also EEOC v. Ohio Edison Co.,* 7 F.3d 541, 543 (6th Cir.1993) ("The statute makes it unlawful for an employer to discriminate against an employee because the employee opposed an unlawful employment practice, or made a charge, or participated in an investigation, proceeding, or hearing related to Title VII."). The range of protected activity includes an employee's "informal complaint to management." *Arzate v. City of Topeka,* 884 F.Supp. 1494, 1503 (D.Kan.1995); *see Tomka,* 66 F.3d at 1308; *Kotcher v. Rosa & Sullivan Appliance Ctr.,* 957 F.2d 59, 65 (2d Cir.1992). *See generally Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir.1978). Here, the evidence supports a finding that Channon began complaining to UPS on the day of Olson's assault, which occurred on November 12, 1993.

In another instruction, the court defined adverse employment action as

an action that detrimentally affects the terms, conditions, or privileges of employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employee are not adverse employment actions.

This instruction correctly defined an adverse employment action. *See Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 885 (7th Cir.1989).

In its motion for directed verdict, the only claim of insufficiency of the evidence that UPS raised was on the adverse employment action element of each claim:

The record evidence with respect to employment decisions after November 12 of 1993 also indicates that Channon like many other UPS employees, was moved from position to position, and that while she disagreed with where she was placed in certain circumstances and wanted other jobs, that she was not in any way demoted, that she did not suffer any loss of salary or benefits, she continued to be paid as a two-unit manager and, in fact, was given raises throughout that period. So the evidence does not establish within the framework required under ... Title VII ... the kind of evidence of an adverse impact on terms or conditions of employment that is required under the law because these transfers and employment decisions did not in any way involve any loss of salary, and, in fact, she received raises, and did not involve any loss of benefits....

Changes in duties or working conditions that do not cause materially significant disadvantages are insufficient to establish the adverse conduct required to make a prima facie case.

**1. Applicable law regarding adverse employment action.** As one court has observed, "[t]he question whether an employee has suffered a materially adverse employment action will normally depend on the facts of each situation." *Bryson v. Chicago State Univ.,* 96 F.3d 912, 916 (7th

Cir.1996). It follows then that "a wide variety of actions, some blatant and some subtle, can qualify." *Id.*

In *Bryson,* the court held there were disputed facts regarding a materially adverse employment action precluding summary judgment. In that case, there were facts showing that a tenured professor lost the title of "Special Assistant to the Dean" and she was banished from university committee work. Finding that these facts were sufficient to raise a fact issue as to the requirement of adverse employment action, the court stated:

> The title, for example, would communicate to others both within the State Colleges and Universities system and outside it what kind of responsibilities had been entrusted to her. Committee work, especially on important committees like Budget and Retention, is often a prelude to an administrative career. [Plaintiff] herself, it is undisputed, had been on a promising job track for such a career.... A sudden loss of all committee responsibilities and the stripping of a title one formerly held (when similar titles continued to be used throughout the university), if proven at trial, would be a loss of tangible employment benefits just as serious as moving an office to an undesirable location, relocating someone's personal files, or isolating the employee from others—all actions courts have held to qualify under Title VII in other cases.... The [trial] court erred in assuming that nothing happened to [plaintiff] because she had not yet applied for a deanship. Depriving someone of the building blocks for such a promotion, if that is what a trier of fact thinks Chicago State did, is just as serious as depriving her of the job itself.

*Bryson,* 96 F.3d at 916–17; *see also Rutan v. Republican Party of Illinois,* 497 U.S. 62, 73, 110 S.Ct. 2729, 2736, 111 L.Ed.2d 52, 65 (1990) (holding that adverse employment action can result where employees find themselves in dead-end positions because of unlawful discrimination).

■ Other forms of adverse employment action include "disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period." *McKenzie v. Atl. Richfield Co.,* 906 F.Supp. 572, 575 (D.Colo.1995).

Courts have held that an adverse employment action can result even without loss of money or benefits. For example, in *Collins v. State,* the court found an adverse employment action when the employer transferred a library employee to a new department where her supervisors were unsure of her new responsibilities and authority, she was largely relegated to reference rather than consulting work, and she had lost her office and telephone. 830 F.2d 692, 703 (7th Cir.1987). In *McCabe v. Sharrett,* the court found an employee suffered adverse employment action where plaintiff had been transferred to a new job where she had fewer responsibilities, was made to perform more menial tasks, and had lesser opportunity for salary increases than in her former job. 12 F.3d 1558, 1564 (11th Cir.1994); *see also de la Cruz v. New York City Human Res. Admin.,* 82 F.3d 16, 21 (2d Cir.1996) (holding that transfer from "elite" division, "which provided prestige and opportunity for advancement to a less prestigious unit, with little opportunity for professional growth" constituted adverse employment action even though units were equal in status); *Goodwin v. Cir. Ct.,* 729 F.2d 541, 547 (8th Cir.1984) (holding that a transfer, with the same pay, from a position as a hearing officer to that of a staff attorney was adverse because the new position was less prestigious).

■ Adverse employment action can occur even when the alleged action happens to result in an increase in pay. *See, e.g., Davis v. City of Sioux City*, 115 F.3d 1365, 1368 (8th Cir.1997) (holding that employee's transfer to higher paying position after she complained of supervisor's sexual harassment was adverse employment action "because position lacked supervisory status, had fewer opportunities for salary increases, and offered [plaintiff] little opportunity for advancement").

■ **2. Analysis.** The district court found that Channon had established her state civil right claims of (1) sexual discrimination in employment and (2) retaliation. *See* Iowa Code §§ 216.6(1) (providing that it is an unfair or discriminatory practice for an employer to "refuse to hire," "classify," "discharge," or "otherwise discriminate in employment" because of the sex of the employee), .11(2) (providing that it is an unfair or discriminatory practice for "[a]ny person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter").

To establish her state claims of sexual discrimination and retaliation, Channon had to prove the same elements as for her sexual discrimination and retaliatory claims under Title VII. Therefore, under the state discrimination and retaliatory claims, as with the Title VII discrimination and retaliatory claims, Channon had to prove that she suffered an adverse employment action.

The district court made detailed findings on Channon's state claims following the jury verdict on the federal claims. As mentioned, these findings were based on the same evidence that the jury heard. We note that UPS does not challenge here the findings the district court made on the state claims. As mentioned, the district court awarded Channon the same damages as the jury awarded on the federal claims.

**a. The district court's findings on the adverse employment action element of the state sexual discrimination claim.** The district court made the following findings on the adverse employment action element of the state sexual discrimination claim which we find are supported in the record and which establish the adverse employment action element for the Title VII sexual discrimination claim:

Following the November 12, 1993 Olson incident, Channon was transferred from manager of the pre-load to human resources to work in compliance reporting to a two-unit manager. Channon was transferred to operations in Des Moines and Burlington for peak season, 1994. Channon was assigned to the special projects team in the spring of 1995. Channon was then transferred to the midnight hub to fill a one-unit supervisor's position. While Channon retained the title, salary and benefits of a two-unit manager, these employment actions constitute constructive demotion because she did not occupy a two-unit manager's position from May 9, 1994 when she was removed from the pre-load until January 1996 when she took over the twilight sort.

On January 6, 1996, Channon became the manager of the twilight sort. She remained in that position until she took inactive status March 1, 1996. Channon was repeatedly stalked and harassed by Olson with no assistance from Warner and Douglas. She was ridiculed and berated as "weak" by Douglas. She was excluded from meetings. She was passed over for the quality coordinator

team and the compliance manager's job. Channon was paid less than Dan Gannon and other similarly situated male two-unit managers. Most importantly, Channon "fell off the mental list" of district manager Clark because of misinformation communicated to Clark by Douglas and Warner. Clark determined Channon had no "verticality" in industrial engineering. Since Channon was not on Clark's "mental list" of people in line for promotion to division manager, Clark was simply trying to find a place to put her when he moved her to the twilight sort.

[T]he actions of Douglas, Warner, and particularly Clark went far beyond "purely lateral transfers." They were not trivial. They involved more than minor changes in working conditions. The actions of Douglas, Warner, and Clark were more disruptive than mere inconveniences or alterations of responsibilities. When Channon fell off Clark's mental list, she was placed at a materially significant disadvantage. Channon proved the action of UPS materially altered the terms or conditions of her employment....

██ **b. The district court's findings on the adverse employment action element of the state retaliation claim.** The district court made the following findings on the adverse employment action element for the state retaliation claim which we find are supported by the evidence and which establish the adverse employment action element for the Title VII retaliation claim:

Channon had a right to complain to her superiors about Olson's boorish behavior. She had a right to consult counsel about her remedies under state and federal law. Channon had a right to file a complaint with the Iowa Civil Rights Commission. She had a right to pursue her remedies by filing this action.

Channon proved her superiors, Warner, Douglas, Clark, and Haas, took adverse employment action against her [because of these complaints] in the form of ridicule, constructive demotion, and lack of support in the face of open hostility about her lawsuit. On April 4, 1994, when Channon tried to explain her problems with Olson to Douglas, he called her "weak," cruelly said in a high-pitched voice "help me, help me" and told her to rip Olson's face off. Channon consulted counsel on May 6, 1994. It is no coincidence that on May 9, 1994, after discussing the matter with Clark, Douglas transferred Channon to human resources. On June 24, 1994, Warner discussed Channon's complaints with her and warned her she could be fired for knowing other employees' salaries.

Channon filed this lawsuit on June 9, 1995. In early July, Clark passed Channon over for the compliance manager's job. On the twilight sort, Goecke refused to meet with Channon alone on the advice of an attorney who turns out to be a relative of his. He told Channon her lawsuit made him sick because it takes food off his table and she should not sue her "partners." Haas tolerated Goecke's conduct because he agreed with him. Haas excluded Channon from meetings and disclosed to Goecke that Channon was "hanging on by a thread."

**D. Evidentiary matters.**

██ UPS contends that the district court allowed Channon to introduce evidence concerning alleged acts of harassment and discrimination throughout the course of her employment with UPS. UPS also contends that the district court permitted Channon to present evidence concerning a variety of complaints of discrimi-

nation and harassment by other female employees at UPS, including allegations of demands for sex. Introduction of this evidence, UPS argues, was prejudicial error in violation of Iowa Rules of Evidence 402 and 403.

As mentioned, this trial lasted five weeks. Twenty-one volumes of transcript cover the proceedings. UPS's argument on this issue fills a little more than half of a page in its brief. UPS makes categorical generalizations about the improperly admitted evidence and fails to cite in the record where it preserved error by objecting to the challenged evidence. We therefore decline to consider the issue. *See Tratchel v. Essex Group, Inc.,* 452 N.W.2d 171, 174 (Iowa 1990) (noting that "use of summarized evidence without citation to the appendix violates Iowa Rule of Appellate Procedure 14(a)(5), (g)" and that "[c]ourts should not be required to search the record to verify the facts and actions taken and are warranted in ignoring uncited contentions, especially in cases where the record is voluminous").

### E. Compensatory damages award.

UPS's final contention is that we should set aside the compensatory damages award because (1) there is insufficient evidence to support a finding of liability against it on Channon's sex discrimination and retaliation claims and (2) the compensatory damages award was excessive.

As mentioned, in its motion for directed verdict, UPS preserved for our review only one insufficiency-of-the-evidence issue: the adverse employment element of the two claims. Because we have determined there was sufficient evidence on the adverse employment element of both claims, we conclude there is no merit in this contention.

UPS makes no argument as to how the compensatory damages award was exces-

sive, and we therefore hold UPS has waived any claimed error on this issue.

### IV. Disposition.

As to Channon's appeal, in sum, we conclude the district court erred in concluding that front pay is subject to the damages cap imposed by 42 U.S.C. § 1981a(b)(3)(D). We therefore reverse on this issue. The district court also erred in concluding that Channon was not entitled to uncapped compensatory damages in the amount of $527,872 under the ICRA and an additional $300,000 in uncapped punitive damages under Title VII. We therefore reverse on this issue as well. However, because the district court correctly awarded $14,605 in liquidated damages pursuant to 29 U.S.C. § 216(b) and did not subject those damages to the cap, we affirm on this issue. We remand for vacation of the district court judgment and order a new judgment be entered as follows: $527,872 in compensatory damages under the ICRA, $300,000 in punitive damages under Title VII, and $14,605 in liquidated damages under 29 U.S.C. § 216(b).

The district court correctly ruled the damages cap was constitutional and properly dismissed Channon's claim of tortious infliction of emotional distress. We therefore affirm on these issues.

As to UPS's cross-appeal, in sum, we conclude that the district court correctly denied UPS's motions for judgment notwithstanding the verdict and new trial because there was sufficient evidence to support Channon's federal claims of equal pay, sex discrimination, and retaliation. We therefore affirm the court's ruling on these motions.

**APPEAL AFFIRMED IN PART AND REVERSED IN PART; CROSS AP-**

PEAL AFFIRMED;  CASE REMAND-
ED WITH DIRECTIONS.